**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

THOMAS EDWARD PATTEN, III,
Administrator of the Estate of
Maura K. Patten,
            *Plaintiff-Appellant,*

            v.

STEPHEN NICHOLS, MD; JUNE FRINKS,
MSW,                                             No. 00-2503
            *Defendants-Appellees,*

            and

L. F. HARDING; JACK W. BARBER,
MD; ROBERT LEADBETTER, MD; JON
R. HAMMERSBERG, MD,
                  *Defendants.*

Appeal from the United States District Court
for the Western District of Virginia, at Harrisonburg.
Jackson L. Kiser, Senior District Judge.
(CA-99-30110)

Argued: September 26, 2001

Decided: December 18, 2001

Before MOTZ, TRAXLER, and GREGORY, Circuit Judges.

---

Affirmed by published opinion. Judge Traxler wrote the opinion, in
which Judge Motz and Judge Gregory joined.

---

## COUNSEL

**ARGUED:** Stephen Winston Bricker, BRICKER & HERRING, P.C., Richmond, Virginia, for Appellant. Colin James Steuart Thomas, III, TIMBERLAKE, SMITH, THOMAS & MOSES, P.C., Staunton, Virginia, for Appellees. **ON BRIEF:** Michael N. Herring, BRICKER & HERRING, P.C., Richmond, Virginia; Rebecca K. Glenberg, AMERICAN CIVIL LIBERTIES UNION OF VIRGINIA FOUNDATION, INC., Richmond, Virginia, for Appellant. Randall T. Perdue, TIMBERLAKE, SMITH, THOMAS & MOSES, P.C., Staunton, Virginia, for Appellees.

---

## OPINION

TRAXLER, Circuit Judge:

Maura Patten, a psychiatric patient, died while she was involuntarily committed to Virginia's Western State Hospital ("WSH"). The representative of Maura's estate (the "Estate") brought an action under 42 U.S.C.A. § 1983 (West Supp. 2001) against Maura's doctor, Appellee Stephen Nichols, and her social worker, Appellee June Frinks (together, the "defendants"). The district court granted summary judgment to the defendants, concluding that the Estate's claim should be measured by a deliberate indifference standard and that the Estate failed to forecast evidence sufficient to show that the defendants' conduct violated that standard. The district court declined to exercise supplemental jurisdiction over the Estate's state law claims and dismissed those claims without prejudice. While we agree with the Estate that the district court applied the wrong legal standard, we nonetheless conclude that the Estate's evidence is insufficient to withstand summary judgment under the proper standard. Accordingly, we affirm.

I.

Maura was diagnosed with chronic undifferentiated schizophrenia, and she had been intermittently hospitalized since 1979 and continually hospitalized at WSH since 1991. Maura also suffered from

chronic obstructive pulmonary disease ("COPD"), which the Estate describes as "a life-threatening condition which impairs a person's ability to obtain and transfer oxygen to the body." Brief of Appellant at 2. In 1994, Maura had an acute COPD episode that required admission to the intensive care unit of another hospital. Maura was significantly overweight and was in the habit of "sneaking" cigarettes when possible. The combination of these factors increased Maura's risk for cardiac problems.

In July 1996, Maura was prescribed clozapine, an anti-psychotic drug whose "black box" warnings[1] included a "propensity to cause 'adverse cardiovascular and respiratory effects,'" J.A. 19, and which also commonly caused weight gain. The Estate alleged that during the year that she was on clozapine, Maura's breathing difficulties increased and her weight increased from 237 to 274 pounds. Maura's medical records show that she received no physical examination between October 1996 and her death on July 7, 1997.

On June 19, 1997, Maura was transferred to a new and more restrictive ward at WSH, where she was placed under the care of Dr. Stephen Nichols, who served as her attending psychiatrist and medical doctor. June Frinks was Maura's attending social worker. Both Nichols and Frinks were familiar with Maura's medical history.

On July 2, 1997, Maura called Margaret Owen, a registered nurse who lived with Maura's brother, and said, "Margaret, I am dying." J.A. 276. Maura told Owen that she wanted to quit taking clozapine, that her breathing was getting worse, and that the hospital was not giving her her asthma medicine. Owen could hear over the phone that Maura was having difficulty breathing and could hear "a gurgling sound" that Owen believed signified fluid in Maura's respiratory tract. J.A. 255. Owen became very concerned about Maura's health

---

[1]The Food and Drug Administration requires drug labels to include a "warnings" section that "describe[s] serious adverse reactions and potential safety hazards, limitations in use imposed by them, and steps that should be taken if they occur." 21 C.F.R. § 201.57(e) (2001). Warnings about the most serious side effects, "particularly those that may lead to death or serious injury, may be required by the Food and Drug Administration to be placed in a prominently displayed box." *Id.*

after the phone call, and the next day she was able to reach Margaret Keller, Maura's sister and "authorized representative" for purposes of making treatment decisions.

On July 3, 1997, Keller called WSH and spoke to Frinks. She told Frinks that Maura told Owen she was dying, and Keller also told Frinks that the family was concerned that Maura's breathing problems were worsening. Maura was in the same room with Frinks during this telephone call and while Keller was speaking to Frinks, Keller could hear through the phone that Maura was having breathing problems. Keller also spoke to Maura at that time and the breathing problems were apparent to Keller during their conversation. Keller demanded that Maura receive a full physical examination, and Frinks told her that an exam could not be arranged before July 7 because of the upcoming holiday weekend. During the phone call, Keller heard Frinks chastise Maura for telling her family that she was dying.

After her conversation with Keller, Frinks went to Dr. Nichols and told him about Maura's statement to her family that she was dying. Frinks and Nichols immediately went to speak to Maura, and found her in a hallway. They spoke to Maura for ten to twenty minutes, and asked her about her phone call to Owen. According to Frinks and Nichols, Maura said that she felt bad about telling her family she was dying, but she explained that she wanted to get their attention so they could help get her medication changed. Nichols asked Maura how she was feeling, and Maura complained about her dislike of clozapine and the new ward. Nichols and Frinks testified in their depositions that Maura never mentioned any physical problems and that they did not see any indications that Maura was in respiratory distress. Frinks called Keller later that day to inform her of the meeting with Maura.[2]

---

[2]There is a question in the record about when Keller told Frinks about the family's concern over Maura's increased breathing problems. Keller's testimony indicates that she told Frinks about the concern (and also heard Maura having breathing problems) during the same conversation in which Keller told Frinks about Maura's "dying" phone call. Frinks, however, believed that Keller raised questions about Maura's breathing problems only when Frinks called Keller back to report that she and Nichols had met with Maura. In any event, Frinks had no recollection of ever telling Dr. Nichols about the family's belief that Maura's breathing problems had worsened, and Nichols stated in his deposition that their concern was not brought to his attention. As we discuss later, the posture of the case requires us to accept the Estate's version of the facts.

Maura's vital signs were not taken during the meeting, and Dr. Nichols did not instruct WSH staff to more closely observe Maura. Frinks made notes in Maura's chart about Maura's phone call to her family, Keller's concern about Maura's heavy breathing, and the hallway meeting with Maura. Dr. Nichols made no record of the phone call or the meeting.

Early in the morning of July 7, a nurse found Maura unresponsive in her bed. Efforts to resuscitate her failed. An autopsy identified "coronary insufficiency" as the immediate cause of death. J.A. 144. The pathologist who supervised Maura's autopsy stated in his deposition that the visual examination of Maura's lungs revealed no evidence of "significant chronic lung disease," but that the microscopic examination found "some changes that suggest previous episodes of failure." J.A. 429. Given the findings from the autopsy, including the size of Maura's heart and the condition of her lungs, the pathologist concluded that Maura probably suffered from episodes of congestive heart failure, the principal symptom of which would have been shortness of breath. The pathologist acknowledged, however, that the shortness of breath may have occurred only hours or minutes before Maura's death.

The Estate also presented evidence from several experts, including Dr. Herbert Friedman. Dr. Friedman stated that "[o]bstructive lung disease impaired [Maura's] respiratory status, which caused her to suffer chronic low oxygen levels, which led to impaired heart function." J.A. 197. Dr. Friedman believed that Maura died "as a result of pulmonary insufficiency causing hypoxia, which[,] in turn, induced cardiac failure." J.A. 197. According to Friedman, Maura "likely was exhibiting symptoms consistent with this condition for a period of days before her death. Her likely symptoms during the five to seven days prior to her death would have included shortness of breath, respiratory secretions and wheezing. She may also have exhibited an increased respiratory rate and tachycardia which would have indicated respiratory compromise." J.A. 198. Dr. Friedman believed that "[t]imely and appropriate medical intervention likely would have interrupted this medical course and saved Ms. Patten's life at any point short of a few hour[s]" before her death. J.A. 197.

Dr. Ronald Koshes, another expert for the Estate, concluded that, given Maura's medical history, "the standard of care required that Dr.

Nichols [e]ither physically examine Ms. Patten or [ ] arrange for others to do so, to assess her vital signs and to identify any symptoms of respiratory or cardiac distress immediately." J.A. 220. Dr. Koshes believed that the visual observation of Maura was insufficient and that the failure to properly examine Maura was "a significant and gross deviation from the standard of care." J.A. 220. Dr. Koshes stated that by failing to order closer and more frequent observation of Maura and by not contacting Maura's family directly to investigate Maura's "dying" claim, "Dr. Nichols deprived himself of valuable information regarding the patient's deteriorating condition." J.A. 221. In his deposition, Dr. Koshes was more direct in his condemnation of the defendants' actions, expressing his belief that "there was not enough attention paid to even determine whether there was anything wrong or not," J.A. 235, and that the defendants "didn't even arrive at first base to make a diagnosis." J.A. 465.

Sometime after Maura's death, the United States Department of Justice began investigating the conditions at WSH. In 1999, the department issued a report in which it concluded that WSH was not providing its patients with adequate mental health treatment or medical care. Maura's death was one of the instances specifically noted in the report. Similar conclusions were reached by Virginia's Department for Rights of Virginians with Disabilities in its investigation of Maura's death.

## II.

The Estate contends that the defendants violated Maura's substantive due process rights under the Fourteenth Amendment by failing to provide Maura with proper medical care. The first question we must address is the standard by which such a claim should be measured.

The substantive component of the due process clause protects against only the most egregious, arbitrary governmental conduct—that is, conduct that can be said to "shock[ ] the conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998); *see also Young v. City of Mount Ranier*, 238 F.3d 567, 574 (4th Cir. 2001). Depending on the circumstances of each case, however, "different degrees of fault may rise to the level of conscience-shocking." *Young*, 238 F.3d at 574; *see Lewis*, 523 U.S. at 850 ("Rules of due process are not,

however, subject to mechanical application in unfamiliar territory. Deliberate indifference that shocks in one environment may not be so patently egregious in another . . . ."); *Miller v. City of Philadelphia*, 174 F.3d 368, 375 (3d Cir. 1999) ("The exact degree of wrongfulness necessary to reach the 'conscience-shocking' level depends upon the circumstances of a particular case."). While it is clear that intentionally harmful conduct may constitute a violation of the Fourteenth Amendment, it is equally clear that negligence alone does not amount to a constitutional violation. *See Lewis*, 523 U.S. at 849 ("[L]iability for negligently inflicted harm is categorically beneath the threshold of constitutional due process. . . . [C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level"). The difficulty comes in determining "[w]hether the point of the conscience shocking is reached when injuries are produced with culpability falling within the middle range, following from something more than negligence but less than intentional conduct, such as recklessness or gross negligence." *Id.* (internal quotation marks omitted). This uncertain middle ground is where the battle in this case is being fought.

The defendants contend that deliberate indifference is the degree of fault that must be established before liability can be imposed. That standard was first applied by the Supreme Court to a convicted prisoner's Eighth Amendment claim that prison officials failed to provide adequate medical care. *See Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). As to denial-of-medical-care claims asserted by pre-trial detainees, whose claims arise under the Fourteenth Amendment rather than the Eighth Amendment, the Supreme Court has yet to decide what standard should govern, thus far observing only that the Fourteenth Amendment rights of pre-trial detainees "are at least as great as the Eighth Amendment protections available to a convicted prisoner." *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983); *see also Bell v. Wolfish*, 441 U.S. 520, 545 (1979) ("[P]retrial detainees, who have not been convicted of any crimes, retain at least those constitutional rights that we have held are enjoyed by convicted prisoners."). This circuit, however, has concluded that denial-of-medical-care claims asserted by pre-trial detainees are governed by the deliberate indifference standard. *See, e.g., Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001); *Young*, 238 F.3d at 575; *Belcher v. Oliver*, 898 F.2d 32, 34 (4th Cir. 1990). Other circuits have reached the

same conclusion. *See, e.g.*, *Chapman v. Keltner*, 241 F.3d 842, 845 (7th Cir. 2001); *Napier v. Madison County, Kentucky*, 238 F.3d 739, 742 (6th Cir. 2001); *Taylor v. Adams*, 221 F.3d 1254, 1257 n.3 (11th Cir. 2000), *cert. denied*, 531 U.S. 1077 (2001); *Barrie v. Grand County, Utah*, 119 F.3d 862, 868-69 (10th Cir. 1997). Like the denial-of-medical-care claims asserted by pre-trial detainees, the Estate's denial-of-medical-care claim is grounded in the Fourteenth Amendment. The defendants therefore contend that the Estate's claim must be treated the same as those of pre-trial detainees and must be measured against the standard of deliberate indifference.

The Estate, however, argues that because Maura had been involuntarily committed to a state psychiatric facility, we must analyze her claim under the standard set forth by the Supreme Court in *Youngberg v. Romeo*, 457 U.S. 307 (1982). In *Youngberg*, the Supreme Court held that a developmentally disabled person who is committed involuntarily to a state hospital retains constitutionally protected liberty interests, and that protection of those interests generally requires the exercise of professional judgment. *See id.* at 321-22. Although the right to receive proper medical care was not at issue in *Youngberg*, the Estate contends that the *Youngberg* standard is equally applicable to denial-of-medical-care claims asserted by involuntarily committed patients.

We acknowledge that there is some appeal to the defendants' view that all Fourteenth Amendment denial-of-medical-care claims should be measured by the same standard. Nevertheless, we agree with the Estate that this case is governed by *Youngberg*. An analysis of the decision in *Youngberg* is necessary to explain this conclusion.

Nicholas Romeo, the plaintiff in *Youngberg*, was a profoundly retarded man with an IQ of between eight and ten who had been committed to a state hospital after his mother could no longer care for him. *See id.* at 309. While in the state hospital, Romeo suffered numerous injuries, some self-inflicted and some inflicted by other residents. *See id.* at 310. Romeo's mother brought a section 1983 action on his behalf, alleging that hospital officials knew that Romeo was being injured but failed to institute appropriate preventative measures, that the defendants improperly restrained Romeo for prolonged periods, and that the defendants were not providing Romeo with appropri-

ate treatment or training for his mental retardation. *See id.* at 311. After being instructed that "deliberate indifference" was the standard for imposing liability, *see id.* at 312, the jury returned a verdict in favor of the defendants.

Sitting en banc, the Third Circuit reversed and remanded for a new trial, concluding that the jury instructions failed to properly define the scope of Romeo's constitutional rights. *See Romeo v. Youngberg*, 644 F.2d 147, 154 (3d Cir. 1980) (en banc), *vacated and remanded*, 457 U.S. 307 (1982). The Third Circuit's majority opinion set forth different standards by which each of Romeo's claims should be judged, standards couched in terms of "compelling necessity," *id.* at 160, "substantial necessity," *id.* at 164, and "least intrusive" alternative, *id.* at 166. A separate concurring opinion authored by Chief Judge Seitz argued that all of Romeo's claims should be governed by a standard that would impose liability only for conduct that is a "substantial departure from accepted professional judgment." *Id.* at 178; *see id.* at 180-81.

The Supreme Court agreed with the Third Circuit's conclusion that mentally retarded patients who are involuntarily committed to state institutions have liberty interests in "safety, freedom of movement, and training." *Youngberg*, 457 U.S. at 315. However, after balancing the individual's liberty interests against the state's interests (including the state's reason for restraining individual liberty, and the fiscal and administrative burdens under which state institutions generally operate), the Supreme Court determined that the standards articulated by the Third Circuit majority imposed too great a burden on the state. The Court explained:

> Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish. At the same time, this standard is lower than the "compelling" or "substantial" necessity tests the Court of Appeals would require a State to meet. . . . We think this requirement would place an undue burden on the administration of institutions such as Pennhurst and also would restrict unnecessarily the exercise of professional judgment as to the needs of residents.

*Id.* at 321-22 (citation omitted). The Court concluded that the "professional judgment" standard "articulated by Chief Judge Seitz affords the necessary guidance and reflects the proper balance between the legitimate interests of the State and the rights of the involuntarily committed." *Id.* at 321. The Court therefore adopted Chief Judge Seitz's view that "the Constitution only requires that the courts make certain that professional judgment in fact was exercised. It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." *Id.* (internal quotation marks omitted). The Court emphasized that a decision, "if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 323 (footnote omitted).

In *Youngberg*, the state conceded that it was obligated to provide "adequate food, shelter, clothing, and medical care" to those committed to state institutions. *Id.* at 315. Thus, no questions about an involuntarily committed patient's right to adequate medical care were before the *Youngberg* Court, although the Supreme Court's opinion seems to fairly clearly reveal its view of the matter. *See Youngberg*, 457 U.S. at 324 (describing "adequate food, shelter, clothing, and medical care" as "the essentials of the care that the State must provide"). While the Estate acknowledges that *Youngberg* does not directly address the right to medical care, it contends that the rationale underlying *Youngberg* compels us to apply its standard to the Estate's denial-of-medical-care claim. We agree.

It is well established that the Due Process Clause of the Fourteenth Amendment serves "as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989). Thus, the clause "confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *Id.* at 196; *see also Youngberg*, 457 U.S. at 317 ("As a general matter, a State is under no constitutional duty to provide substantive services for those within its border."). There are, however, certain exceptions to this general rule.

The Eighth Amendment obligates the state to provide medical care to incarcerated prisoners. *See Estelle*, 429 U.S. at 103-04. The Fourteenth Amendment likewise obligates the state to provide medical care to suspects injured while being apprehended by the police. *See City of Revere*, 463 U.S. at 244. And, as explained by *Youngberg*, the Fourteenth Amendment obligates the state to provide certain services to involuntary committed psychiatric patients.[3] As the Supreme Court explained in *DeShaney*, these exceptions to the general no-duty-to-act rule are rooted in the fact the state has custody over the person asserting the claims:

> [*Estelle* and *Youngberg*] [t]aken together . . . stand only for the proposition that when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause. The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf. In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, insti-

---

[3]Although *Youngberg* involved involuntarily committed mentally retarded patients, its standard is routinely applied to cases involving involuntarily committed mentally ill patients. *See, e.g.*, *Kulak v. City of New York*, 88 F.3d 63, 75 (2d Cir. 1996); *Estate of Porter v. Illinois*, 36 F.3d 684, 688 (7th Cir. 1994). The defendants do not suggest that the *Youngberg* standard is inapplicable because of any perceived distinction between the scope of the rights of involuntarily committed mentally retarded patients and those of involuntarily committed psychiatric patients.

tutionalization, or other similar restraint of personal liberty
—which is the deprivation of liberty triggering the protec-
tions of the Due Process Clause, not its failure to act to pro-
tect his liberty interests against harms inflicted by other
means.

*DeShaney*, 489 U.S. at 199-200 (footnote and internal citations omit-
ted).

It is no surprise that the *DeShaney* Court included medical care in
its list of "basic human needs," and the defendants make no attempt
to lessen the importance of adequate medical care. Given that the
state's obligation to provide for an involuntarily committed patient's
basic needs springs from the very fact of custody and the resulting
inability of the patient to see to those needs, we do not believe that
we can carve out medical care from that list of needs and give it a dif-
ferent level of constitutional protection simply because the Supreme
Court in *Youngberg* was not called upon to consider the right to medi-
cal care. Moreover, the Supreme Court in *Youngberg* did address the
extent of an involuntarily committed patient's constitutional right to
safety—specifically, the patient's right to be protected from self-
inflicted harm and harm inflicted by others. We can see no difference
between a patient's need to be protected from harm and the need for
medical care that is significant enough to warrant the application of
different standards to those claims.

In a slightly different context, the Supreme Court has reached the
same conclusion. In *Wilson v. Seiter*, 501 U.S. 294 (1991), the Court
addressed the standard that should be applied to a convicted prison-
er's Eighth Amendment challenge to the conditions of his confine-
ment. The Court concluded that such claims should be measured
under the deliberate indifference standard, the standard that is also
applied to prisoner's denial-of-medical-care claims. *See id.* at 303.
The Court explained:

[W]e see no significant distinction between claims alleging
inadequate medical care and those alleging inadequate "con-
ditions of confinement." Indeed, the medical care a prisoner
receives is just as much a "condition" of his confinement as
the food he is fed, the clothes he is issued, the temperature

he is subjected to in his cell, and the protection he is afforded against other inmates. There is no indication that, as a general matter, the actions of prison officials with respect to these nonmedical conditions are taken under materially different constraints than their actions with respect to medical conditions.

*Id.*; *accord Young*, 238 F.3d at 575 (stating that a claim of failure to protect from harm "is no different in any meaningful respect from the indifferent-to-medical-needs claim"); *see also Hare v. City of Corinth*, 74 F.3d 633, 644 (5th Cir. 1996) (en banc) (noting "the absence of a constitutionally significant distinction between failure-to-protect and medical care claims").

Because there is no constitutionally significant difference between the nature of the protection-from-harm claims specifically addressed by the Supreme Court in *Youngberg* and the denial-of-medical-care claim asserted by the Estate in this case, we believe that the Estate's claim must be measured against the professional judgment standard articulated by the Court in *Youngberg*. And contrary to the defendants' argument, we do not believe that a different conclusion is warranted by the cases applying the deliberate indifference standard to denial-of-medical-care claims asserted by pre-trial detainees.

As discussed above, the deliberate indifference standard had its genesis in and is the same standard applied to Eighth Amendment cases involving claims asserted by convicted prisoners. In *Youngberg*, however, the Supreme Court stated that "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg*, 457 U.S. at 321-22. Applying the deliberate indifference standard to the Estate's claim would be giving involuntarily committed patients the *same* treatment as that afforded to convicted prisoners, a result the *Youngberg* Court specifically condemned. *See id.* at 325 ("[W]e conclude that the jury was erroneously instructed on the assumption that the proper standard of liability was that of the Eighth Amendment"); *see also Boring v. Kozakiewicz*, 833 F.2d 468, 472 (3d Cir. 1987) ("To apply the Eighth Amendment standard to mentally retarded persons would be little short of barbarous."); *Estate of Porter v. Illinois*, 36 F.3d 684, 688

(7th Cir. 1994) (stating that the application of the deliberate indifference standard to cases involving involuntarily committed patients "would undermine the Court's pronouncement that involuntarily committed patients are entitled to more protected 'conditions of confinement' than convicted criminals").

The defendants, however, argue that to apply the professional judgment standard to cases like Maura's would create an inconsistency in the treatment of substantially identical claims. That is, Fourteenth Amendment denial-of-medical-care claims asserted by pre-trial detainees would be measured against the deliberate indifference standard, while Fourteenth Amendment denial-of-medical-care claims asserted by involuntarily committed psychiatric patients would be measured against the professional judgment standard. The defendants insist that it would be improper to measure the same type of Fourteenth Amendment claim against different standards depending on the circumstances under which the plaintiff came to be in state custody. But the result urged by the defendants would also create an inconsistency, one that we believe is far more problematic.

If the defendants are correct that all Fourteenth Amendment denial-of-medical-care claims must be measured under the deliberate indifference standard, regardless of the status of the plaintiff, then different legal standards would apply to different aspects of the claims of a single involuntarily committed patient. Suppose, for example, that a state hospital failed to protect an involuntarily committed patient from an assault by another patient, and that the hospital also failed to treat the injuries the patient suffered in the assault. Under the defendants' analysis, the patient's claim that the hospital failed to protect him from assault (an issue specifically addressed in *Youngberg*) would be measured under *Youngberg*'s professional judgment standard, but the failure-to-provide-medical-care claim would be measured under the deliberate indifference standard. Yet the defendants do not even attempt to explain why the circumstances surrounding the operation of a psychiatric hospital require the application of disparate standards to similar claims. A consideration of the standards applicable to certain Eighth Amendment claims may help illustrate this point.

During a prison disturbance, prison officials must act "in haste, under pressure." *Whitley v. Albers*, 475 U.S. 312, 320 (1986). Given

the nature of a prison disturbance and the competing interests at stake, the Supreme Court in *Whitley* concluded that it would be inappropriate to measure the prison officials' response to a disturbance by the same standard (deliberate indifference) that governs their conduct with regard to general conditions of confinement:

> The deliberate indifference standard articulated in *Estelle* was appropriate in the context presented in that case because the State's responsibility to attend to the medical needs of prisoners does not ordinarily clash with other equally important governmental responsibilities. Consequently, "deliberate indifference to a prisoner's serious illness or injury" can typically be established or disproved without the necessity of balancing competing institutional concerns for the safety of prison staff or other inmates. But, in making and carrying out decisions involving the use of force to restore order in the face of a prison disturbance, prison officials undoubtedly must take into account the very real threats the unrest presents to inmates and prison officials alike, in addition to the possible harms to inmates against whom force might be used. . . . In this setting, a deliberate indifference standard does not adequately capture the importance of such competing obligations, or convey the appropriate hesitancy to critique in hindsight decisions necessarily made in haste, under pressure, and frequently without the luxury of a second chance.

*Id.* (citation omitted). The Supreme Court therefore concluded that a higher standard should be applied to claims based on actions taken to quell dangerous prison disturbances. *See id.* at 320-21.

Unlike claims arising from actions taken in response to a violent prison disturbance, denial-of-medical-care claims in psychiatric hospitals typically do not arise under extraordinary circumstances that would require the balancing of competing obligations (such as the need to protect the safety of other patients) when considering the propriety of the hospital's response. That is, providing medical care to a given patient usually does not jeopardize the safety of hospital employees or patients or otherwise affect the hospital's ability to fulfill its other obligations. *Cf. id.* ("[T]he State's responsibility to attend

to the medical needs of prisoners does not ordinarily clash with other equally important governmental responsibilities."). This is not to say that medical emergencies do not arise—of course they do, just as emergencies arise that involve a hospital's obligation to protect the safety of its patients. But *Youngberg* clearly establishes that a hospital's obligation to protect the safety of its patients is measured by the professional judgment standard, and there is no reason to think that the hospital generally will attend to its obligation to provide medical care under circumstances substantially different from those under which the hospital attends to its obligation to protect the patient's safety. *Cf. Seiter*, 501 U.S. at 303 ("There is no indication that, as a general matter, the actions of prison officials with respect to these nonmedical conditions [including the protection of inmates from attack by other inmates] are taken under materially different constraints than their actions with respect to medical conditions."). We believe that to require denial-of-medical-care claims asserted by involuntarily committed patients to be judged against a standard different from that governing the same patients' claims involving equally important needs such as safety would add an unnecessary complication that is not justified by conditions inherent in the purpose or operation of a psychiatric hospital or in the nature of the denial-of-medical-care claims themselves. *Cf. Romeo v. Youngberg*, 644 F.2d 147, 175 (3d Cir. 1980) (en banc) (Seitz, C.J., concurring) ("Protection, restraint, and treatment are not severable issues in the context of the institutionalized mentally retarded. I believe that a single standard can be established to protect the constitutional rights of committed persons while recognizing the legitimate interests of the state.").

In our view, however, there are sufficient differences between pretrial detainees and involuntarily committed psychiatric patients to justify the arguable inconsistency that springs from the application of *Youngberg*'s professional judgment standard to denial-of-medical care claims asserted by involuntarily committed patients. The most obvious and most important difference is the reason for which the person has been taken into custody. A person may be involuntarily committed in Virginia if there is probable cause to believe that the person "presents an imminent danger to self or others as a result of mental illness, or is so seriously mentally ill as to be substantially unable to care for self," and the person "is incapable of volunteering

or unwilling to volunteer for treatment." Va. Code Ann. § 37.1-67.01. One of the main purposes of such commitment is, of course, to provide treatment. *See* Va. Code Ann. § 37.1-67.3 (establishing procedures for "involuntary admission and treatment" and requiring report from examining psychiatrist or psychologist to state "whether the person is . . . in need of involuntary hospitalization or treatment"); Va. Code Ann. § 37.1-67.4 ("Any . . . institution caring for a person placed with it pursuant to a temporary order of detention is authorized to provide emergency medical and psychiatric services within its capabilities when the institution determines such services are in the best interests of the person within its care."). A pre-trial detainee, however, is taken into custody because the state believes the detainee has committed a crime, and the detainee is kept in custody to ensure that he appears for trial and serves any sentence that might ultimately be imposed. *See Bell*, 441 U.S. at 534. Moreover, pre-trial detainees generally are housed in jails or prisons staffed by law enforcement officials, while involuntarily committed patients generally are housed in hospitals staffed by medical professionals. Finally, while some involuntarily committed patients are confined for short periods of time, many patients face lengthy and even lifelong confinement. Pre-trial detainees, however, usually retain that status for a relatively short period of time, until released on bond or until the resolution of the charges against them. Therefore, even though pre-trial detainees and involuntarily committed patients both look to the Fourteenth Amendment for protection and neither group may be punished (in the Eighth Amendment sense), it can hardly be said that the groups are similarly situated. The differences in the purposes for which the groups are confined and the nature of the confinement itself are more than enough to warrant treating their denial-of-medical-care claims under different standards.[4]

---

[4]The defendants contend that our decisions in *Young v. City of Mount Ranier*, 238 F.3d 567 (4th Cir. 2001), and *Buffington v. Baltimore County, Md.*, 913 F.2d 113 (4th Cir. 1990), support their view that all Fourteenth Amendment denial-of-medical-care claims must be measured under the deliberate indifference standard. We disagree. While the decedents in *Young* and *Buffington* were detained for psychiatric evaluations and had not been charged with any crime at the time of their deaths, the claims asserted in those cases were based on police action (or inaction) occurring while the decedents were in police custody. *See Young*, 238 F.3d at 570; *Buffington*, 913 F.2d at 116-17. The decedents, therefore, were more similar to traditional pre-trial detainees than to patients involuntarily committed to psychiatric hospitals.

The defendants, however, suggest that after *DeShaney*, it is improper to consider the purpose for which an individual was taken into custody or the conditions under which the individual is kept in custody when determining the appropriate liability standard. They contend that under *DeShaney*, the only relevant inquiry is whether a state has taken a person into custody. If a custodial relationship exists, then the state's Fourteenth Amendment obligations arise, and "the" Fourteenth Amendment standard for denial-of-medical-care claims must be applied. "The" standard, in the defendants' view, is the deliberate indifference standard. We disagree.

As discussed above, the Supreme Court in *DeShaney* made it clear that an exception to the general no-duty-to-act rule arises only if the state takes an individual into custody; if there is no custodial relationship, then the state has no duty to protect. *See DeShaney*, 489 U.S. at 199-200. But *DeShaney* did not address the scope of inquiry that should be undertaken if a custodial relationship does exist, and the Court even after *DeShaney* has continued to carefully consider, as it did in *Youngberg*, the factual context in which a substantive due process claim is raised so as to ensure the proper balancing of the interests of the individual and the state. *See Lewis*, 523 U.S. at 850 ("[O]ur concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking."); *id.* at 851 ("[A]ttention to the markedly different circumstances of normal pre-trial custody and high-speed law enforcement chases shows why the deliberate indifference that shocks in the one case is less egregious in the other . . . ."). Moreover, because the Court in *DeShaney* concluded that the state in that case had no obligation to protect the plaintiff because the plaintiff was not in state custody when he was injured, it should not be surprising that *DeShaney* simply does not address the question we face here—what liability standard should be applied in cases where the state does have a constitutional obligation to a person in its custody. Thus, nothing in *DeShaney* renders improper our consideration of the nature and purpose of the confinement of involuntarily committed psychiatric patients when determining the proper standard to be applied to the constitutional claims of such patients.[5]

---

[5]The defendants also suggest that *DeShaney* casts some doubt on *Youngberg*'s continuing vitality, a view shared by the Fifth Circuit. *See*

Nothing in the nature of a denial-of-medical-care claim or the interests of state officials in responding to a civilly committed patient's need for medical care warrants treating such claims under a standard different from the standard governing similar claims established by the Supreme Court in *Youngberg*. We therefore conclude that denial-of-medical-care claims asserted by involuntarily committed psychiatric patients must be measured under *Youngberg*'s "professional judgment" standard.[6] *See Kulak v. City of New York*, 88 F.3d 63, 75 (2d Cir. 1996) (applying the professional judgment standard to an involuntarily committed patient's claim that hospital employees improperly medicated him and failed to monitor the effects of the medication); *Gilbert v. Texas Mental Health & Mental Retardation*, 919 F. Supp. 1031, 1038 (E.D. Tex. 1996) (applying the *Youngberg* standard to section 1983 claims asserting that an involuntarily committed patient died because the defendants failed, *inter alia*, to provide adequate medical care); *Lelsz v. Kavanagh*, 673 F. Supp. 828, 845 (N.D. Tex. 1987) (applying *Youngberg*'s professional judgment standard to claims regarding the adequacy of medical care given to involuntarily committed patients); *see also United States v. Charters*, 863 F.2d 302, 312 (4th Cir. 1988) (en banc) (stating that *Youngberg* established "the basic principle . . . that a legally institutionalized mental patient is entitled to the exercise of 'professional judgment' by those who have the responsibility for making medical decisions that affect his retained liberty interests"); *Savidge v. Fincannon*, 836 F.2d 898, 907-08 (5th Cir. 1988) (indicating that the right to a "reasonably

---

*Hare v. City of Corinth*, 74 F.3d 633, 647 (5th Cir. 1996) (en banc). The Supreme Court, however, has not overruled *Youngberg*, and has, even after *DeShaney*, continued to cite *Youngberg* in various contexts. *See, e.g.*, *Lewis*, 523 U.S. at 852 n.12; *Collins v. City of Harker Heights*, 503 U.S. 115, 127 (1992); *Washington v. Harper*, 494 U.S. 210, 221-22 (1990). We therefore are not free to disregard *Youngberg*, as the defendants would have us do.

[6]Because we conclude that the *Youngberg* standard governs medical-care claims asserted by involuntarily committed psychiatric patients, we decline the defendants' invitation to adopt the approach of the Fifth Circuit as set forth in *Hare*. *See Hare*, 74 F.3d at 644 (concluding that the standard to be applied to claims asserted by pre-trial detainees depends on whether the claims involve "challenges to conditions, practices, rules, or restrictions on the one hand, and episodic acts or omissions on the other").

safe physical environment" established by *Youngberg* includes the "right to minimally adequate shelter and medical care").

### III.

Having determined that the *Youngberg* standard applies to the Estate's claim, we now consider whether the Estate's evidence, when analyzed under the proper standard, is sufficient to withstand summary judgment. We answer that question in the negative.

In malpractice cases brought under state law, liability typically is based on negligence, which can be established by showing *any* departure from the applicable standard of care. *See, e.g.*, *Rogers v. Marrow*, 413 S.E.2d 344, 346 (Va. 1992) ("In order to recover for medical negligence, the plaintiff ordinarily must prove through the use of expert testimony the applicable standard of care, a deviation from that standard, proximate causation, and damages."). But, as noted previously, liability under the due process clause cannot be imposed for mere negligence, a principle reflected in the professional judgment standard's requirement of a "*substantial departure* from accepted professional judgment." *Youngberg*, 457 U.S. at 323 (emphasis added). Beyond recognizing that the standard requires proof of more than mere negligence, courts have had some difficulty determining precisely how far the professional judgment standard falls from negligence on the culpability continuum. *Compare Yvonne L. v. New Mexico Dep't of Human Servs.*, 959 F.2d 883, 894 (10th Cir. 1992) (doubting whether "there is much difference" between the deliberate indifference standard and the *Youngberg* standard), *with UNITED STATES DEPARTMENT OF EDUCATION, Washington, D.C. v. New York City Dep't of Soc. Servs.*, 709 F.2d 782, 790 (2d Cir. 1983) (stating that in *Youngberg*, "the Court adopted what is essentially a gross negligence standard"); *see also Shaw v. Strackhouse*, 920 F.2d 1135, 1146 (3d Cir. 1990) ("Professional judgment, like recklessness and gross negligence, generally falls somewhere between simple negligence and intentional misconduct."). But wherever the professional judgment standard belongs on that continuum, we conclude that the Estate's evidence is insufficient.

Because this is an appeal from the granting of summary judgment, we must view the evidence and all reasonable inferences that can be

drawn therefrom in the light most favorable to the Estate. *See, e.g.,* *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Therefore, for purposes of this opinion, we assume that Keller, Maura's sister, told Frinks about Maura's "I'm dying" telephone call and about the family's concern over the apparent increase in Maura's breathing problems in the same telephone call, before the defendants spoke with Maura in the hallway. We also assume that Maura was breathing more heavily than usual at the time of Keller's phone call. Finally, we assume that Frinks in fact told Nichols about the family's concern before the defendants met with Maura. But even with these assumptions, we cannot conclude that the Estate's evidence demonstrates that the defendants failed to exercise professional judgment.

When Frinks learned of Maura's phone call and the family's concern about Maura's breathing problems, she took that information seriously enough to immediately inform Nichols about it. Nichols likewise took the information seriously enough to immediately seek out Maura so that he could evaluate the situation. They spoke to Maura for ten minutes or more, from a distance of a few feet away. According to the testimony of the defendants, Maura explained her "dying" telephone call as simply a way to get her family involved in her campaign to be taken off clozapine. The defendants were well acquainted with Maura's physical condition and her "baseline" level of functioning, and they testified in their depositions that Maura exhibited no physical symptoms of increased respiratory problems or otherwise gave them any reason to suspect that her condition was deteriorating. Thus, the evidence establishes that the defendants in fact took immediate action when they learned of Maura's phone call and that, after talking to Maura and observing and evaluating her, the defendants were satisfied that Maura was not in danger. While the defendants' belief might have turned out to have been wrong, their actions nonetheless exhibited both professional concern and judgment and therefore were sufficient to satisfy the requirements of *Youngberg*. *See Youngberg*, 457 U.S. at 321 ("[T]he Constitution only requires that the courts make certain that professional judgment in fact was exercised. It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." (internal quotation marks omitted)).

Unlike the Estate, we do not believe that this conclusion is affected by the evidence showing that Frinks and Nichols knew Maura's

breathing was more labored during the phone conversation between Frinks and Maura's sister, which took place shortly before the hallway meeting with Maura. The Estate contends that from this evidence it is reasonable to infer that, contrary to the defendants' testimony, Maura was experiencing breathing problems during the hallway meeting. The Estate argues that the jury therefore could find a violation of the professional judgment standard from the defendants' failure to treat Maura's worsening breathing problems. We are not convinced, however, that the inference urged by the Estate is a proper one.

The pathologist who supervised Maura's autopsy found evidence that Maura had episodes of congestive heart failure, which would have caused wheezing and shortness of breath, but he acknowledged that this shortness of breath might have occurred only shortly before Maura's death. Moreover, one of the Estate's own experts stated that a "waxing and waning" of symptoms was "not inconsistent with folks who have pretty far-advanced COPD." J.A. 228. In light of this evidence, we question whether it is reasonable to infer from a prior episode of breathing problems that Maura was having those same difficulties during her meeting with the defendants. *See Sylvia Dev. Corp. v. Calvert County, Md.*, 48 F.3d 810, 818 (4th Cir. 1995) ("Whether an inference is reasonable cannot be decided in a vacuum; it must be considered in light of the competing inferences to the contrary." (internal quotation marks omitted)). But even when we give the Estate the benefit of this inference and assume that Maura was breathing heavily during the hallway meeting, we cannot equate the defendants' failure to recognize the significance of the heavy breathing with a failure to exercise professional judgment.

Although the Estate's experts characterized the defendants' actions as significant departures from the applicable standards of care, the question is not whether an expert's report recites the requisite legal terms of art. *Cf. Young*, 238 F.3d at 577 ("The presence . . . of a few conclusory legal terms does not insulate a complaint from dismissal under Rule 12(b)(6) when the facts alleged in the complaint" do not support the legal conclusion.). Instead, the question is whether the evidence provides a factual basis upon which a jury could reasonably find for the party opposing summary judgment. *See Sylvia Dev. Corp.*, 48 F.3d at 818 (explaining that the party opposing a summary judgment motion "must present sufficient evidence such that reason-

able jurors could find by a preponderance of the evidence for the non-movant" (internal quotation marks omitted)).

We have no doubt that the defendants could have done more than just talk to Maura from across a hallway, and we suspect that the Estate's evidence would be sufficient to withstand a motion for summary judgment if this were simply a medical malpractice case. But, as discussed above, evidence establishing mere departures from the applicable standard of care is insufficient to show a constitutional violation; *Youngberg* requires that the evidence show "such a *substantial* departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg*, 457 U.S. at 323 (emphasis added). As explained by Chief Judge Seitz, whose formulation of the professional judgment standard was adopted by the *Youngberg* Court, *see* 457 U.S. at 321, the professional judgment standard

> is not a malpractice standard. By "accepted professional judgment" I do not mean some standard employed by a reasonable expert or a majority of experts in the community, as state malpractice actions would require, but rather that *the choice in question was not a sham or otherwise illegitimate. The jury is to decide only whether the defendants' conduct had some basis in accepted professional opinion.* Furthermore, unlike state malpractice actions, a departure from accepted professional judgment must be substantial to give rise to liability. Although violations of the standard that I have developed would probably contravene state malpractice standards as well, this does not mean that the two standards are coextensive. The "substantial departure from accepted professional judgment" standard effectively distinguishes between conduct that violates the minimum requirements of the Constitution and conduct, such as ordinary malpractice, that does not.

*Romeo v. Youngberg*, 644 F.2d 147, 178 (3d Cir. 1980) (en banc) (Seitz, C.J., concurring) (emphasis added). The Estate's evidence shows only that there was more that could have been done by the defendants. Here, however, such evidence establishes nothing more than ordinary medical negligence. *Cf. Estelle*, 429 U.S. at 107 (con-

cluding that prisoner's claim that doctors should have ordered an X-ray "is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. *At most it is medical malpractice*, and as such the proper forum is the state court under [that state's tort claims act]." (emphasis added)).[7]

As we explained in a somewhat different context in *Charters*, the professional judgment standard "makes inappropriate any attempt by the courts to determine the 'correct' or 'most appropriate' medical decision." *Charters*, 863 F.2d at 313. Instead, the proper inquiry is whether the decision was "so completely out of professional bounds as to make it explicable only as an arbitrary, nonprofessional one. This standard appropriately defers to the necessarily subjective aspects of the decisional process of institutional medical professionals and accords those decisions the presumption of validity due them." *Id.* (citation omitted)). Because there is insufficient evidence from which a jury could conclude that the defendants so substantially departed from professional standards that their decisions can only be described as arbitrary and unprofessional, the Estate has failed to create a material issue of fact as to whether the defendants can be held liable under the professional judgment standard.

IV.

To summarize, we conclude that denial-of-medical-care claims asserted by involuntarily committed psychiatric patients must be measured under the "professional judgment" standard established by the Supreme Court in *Youngberg v. Romeo*, 457 U.S. 307 (1982). But even under that standard, the Estate's evidence is insufficient to survive the defendants' motion for summary judgment. We therefore affirm the district court's grant of summary judgment in favor of the defendants on the Estate's section 1983 claims.

*AFFIRMED*

---

[7]While *Estelle* involved an Eighth Amendment claim brought by a convicted prisoner that was governed by the deliberate indifference standard, we do not believe that fact lessens the significance of the Court's characterization of the inmate's claim as amounting to no more than common medical malpractice.