HENRY COKE MORGAN, JR. SENIOR UNITED STATES DISTRICT JUDGE
Plaintiff brings this action pursuant to 42 U.S.C. § 1983, alleging that, while he was a patient at Central State Hospital ("CSH"), he was denied treatment for mental health issues, forcibly medicated, and unreasonably restrained. Plaintiff also alleges that another patient was allowed, and encouraged, to attack and harm him.
This matter is before the Court following a bench trial held May 29, 2018 through June 7, 2018, at which Plaintiff and Defendants presented evidence and argument. At the close of Plaintiff's case in chief, the Court GRANTED judgment as a matter of law in favor of Defendant Wolf, as Plaintiff was unable to proffer any corroborated evidence against Defendant Wolf. After the trial, the Court GRANTED judgment for Defendants on Count II, and GRANTED judgment in favor of Plaintiff on Count III against Defendant *748 Barnette. The Court RESERVED RULING on Counts I and IV, and on the issue of damages. The Court allowed the parties until June 28, 2018, to submit briefs upon the remaining issues. All parties timely filed briefs. As to the remaining Counts, the Court GRANTS judgment against Defendant Yaratha on Counts I and IV, GRANTS judgment in favor of Defendant Vauter on Counts I and IV, and GRANTS judgment in favor of Defendant Maghakian on Count I. The Court GRANTS injunctive relief against Defendant Vauter. The Court's findings of fact and conclusions of law explain the Court's reasoning with respect to all Counts.
I. FINDINGS OF FACT
Plaintiff is a 39-year-old man who at the time of the allegations that gave rise to the instant lawsuit was an involuntarily committed patient at CSH. Believing that a brief history of Plaintiff's life-from his early years until his admission to CSH-will provide context for the claims brought in this case, the Court FINDS the following.
Plaintiff was born to a young mother who reportedly used drugs and attempted suicide while pregnant. During his early childhood, Plaintiff lived with his mother and adoptive father, both of whom struggled with alcohol and multi-drug addictions that rendered them inattentive and neglectful. Plaintiff's mother attempted suicide repeatedly. One report states that Plaintiff was abused and neglected.
At age 7, Plaintiff's parents separated, and Plaintiff lived with his adoptive father. Plaintiff was first hospitalized at age 9, after allegedly threatening to kill his mother. Plaintiff was committed to the Portsmouth Psychiatric Center for a month. At age 10, Plaintiff began drinking. In his preteen years Plaintiff began using drugs. Allegedly, his adoptive father facilitated Plaintiff's drug use. Plaintiff was sexually abused by a neighbor who would allow Plaintiff to skip school at his house, give Plaintiff alcohol, and sexually abuse him. At age 10, Plaintiff began to swallow objects, drink chemicals, and scratch his wrists. Plaintiff lived with his biological father for approximately one year. However, Plaintiff ran away frequently, allegedly because his father would beat him, pull his hair, and throw him into furniture and walls. At age 12, Plaintiff was hospitalized at Tidewater Psychiatric Institute after running away and skipping school. At age 13, Plaintiff was treated at the Barry Robinson Center, however, Plaintiff repeatedly ran away. Plaintiff began living on the streets. Plaintiff was arrested for stealing and sent to Tidewater Detention Home. Plaintiff began cutting himself and attempted to hang himself. Plaintiff reportedly learned about self-cutting from other patients with borderline personality disorder while in mental health facilities. Plaintiff's self-harming behavior resulted in him being sent to Riverside Hospital, and then to the Commonwealth Center for Children and Adolescents.
Since the age of 13, Plaintiff has been almost continually confined in hospitals or correctional facilities such as Shenandoah Detention Home, Barrett Learning Center, the Pines Treatment Center, Crisis Home, Norfolk Psychiatric Center, Liberty Forensic Unit, Eastern State Hospital, CSH, Western State Hospital, Tidewater Detention Center, and other such facilities.
In November of 1998, Plaintiff was hospitalized at Eastern State Hospital, when he learned that his grandmother had died. Plaintiff became depressed and began to hear voices coming from his locker. Plaintiff became suicidal, and barricaded himself in his room. Plaintiff set fire to his sheets and blanket, and used glass from a flashlight to cut himself. Plaintiff made no attempt to leave the room despite strong smoke. Plaintiff had to be pulled out by a *749 staff member. As a result of his suicide attempt, Plaintiff was charged with Arson and Destruction of Government Property. Plaintiff was found not guilty by reason of insanity, and committed to the Department of Behavior and Developmental Services. Plaintiff was institutionalized at CSH.
While at CSH, Plaintiff was charged with two (2) counts of malicious wounding in 2000. Plaintiff was found guilty and remanded to the custody of the Virginia Department of Corrections on November 16, 2000. While incarcerated, Plaintiff was intermittently returned to CSH for emergency treatment. In 2002, while incarcerated at Sussex I State Prison, Plaintiff incurred a charge of felonious assault. As a result, Plaintiff remained incarcerated for an additional ten years. Subsequently, Plaintiff was housed at Virginia's highest security facilities: Red Onion State Prison and Wallens Ridge State Prison. However, Plaintiff was repeatedly committed to Marion Correctional Treatment Center for self-harming behavior. While at Marion Correctional Treatment Center, Plaintiff swallowed a plastic spoon which required a colostomy. Plaintiff transferred to Powhatan Correctional Center's mental health unit.
On August 14, 2012, Plaintiff was committed to CSH based on a continuing confinement order. Plaintiff's treatment while at CSH is the basis of this action and will be discussed in depth in the following opinion.
During his time at CSH, Plaintiff filed over a thousand complaints and allegations of abuse or neglect against various staff members. See Tr. 534:21-23. He has also filed over twenty-five (25) lawsuits in this district alone. The Court notes that such behavior is consistent with the symptoms of his Borderline Personality Disorder ("BPD"). The record is not sufficient for the Court to determine whether or how often Plaintiff has had the benefit of professional testimony or the opportunity to testify in his own behalf in his other legal proceedings, many of which appear to have been decided on the pleadings. However, when Plaintiff was given the benefit of able counsel, professional testimony, and an opportunity to be fully heard in this case, he prevailed to a significant extent. The Court also notes that although the vast majority of Plaintiff's complaints at CSH were dismissed, at least sixteen (16) of his allegations of abuse or neglect were found to be substantiated. Tr. 535:10-12.
A. Count I
Count I, asserted against Defendants Yaratha, Maghakian, and Vauter, alleges that Plaintiff was denied therapy designed to assist him in progressing toward release from commitment.[1] As detailed above, Plaintiff entered the mental health system when he was just a young child. In 1998, as a result of the Arson charge brought against Plaintiff, Dr. McWilliams evaluated Plaintiff for purposes of a Not Guilty by Reason of Insanity ("NGRI") defense. See Plaintiff's Exhibit ("PE") 58. At that time, Dr. McWilliams diagnosed Plaintiff with BPD and recommended that he receive dialectical behavior therapy ("DBT").[2] Although *750 Dr. McWilliams found Plaintiff eligible for a NGRI defense based upon the finding that Plaintiff experienced a brief psychotic episode at the time of the offense, he cautioned that commitment to a mental institution that might not provide DBT could leave Plaintiff without treatment and result in life-long institutionalization in mental hospitals and prisons.[3] Dr. McWilliams' predictions were prophetic. Plaintiff was found NGRI and committed to the custody of the Department of Behavioral Health and Developmental Services. To date, Plaintiff has not received DBT and he has spent more than twenty (20) years continuously institutionalized in mental hospitals and prisons.
Dr. McWilliams testified as Plaintiff's expert as to why he diagnosed Plaintiff with BPD and why he believed DBT was necessary to treat the disorder. He explained that individuals with BPD often come from abusive backgrounds and struggle to establish and maintain healthy interpersonal relationships. See Tr. 274:2-14. Unable to trust that somebody loves them, they engage in harmful and manipulative behaviors designed to test relationships to the breaking point.[4] When those relationships ultimately fail, the BPD patient's disordered perspective is reinforced. Dr. McWilliams testified that DBT consists of a range of one-on-one cognitive and behavioral techniques that are designed to teach the patient how to develop and sustain relationships. See Tr. 274-77. There is a heavy emphasis on the therapist's role and responsibility in developing the rapport necessary for a successful working relationship with the patient, who by virtue of his disorder cannot be expected to contribute positively to that relationship without significant help. See Tr. 277. Because of DBT's focus on the individual patient's history and problems, Dr. McWilliams testified, one-on-one therapy is best and group therapy is not recommended. Tr. 309:25-310:8. Dr. McWilliams further testified that medication is generally ineffective for treating BPD, to which Dr. Yaratha agreed. See Tr. 278:16-279:3; 335:11-13. In Dr. McWilliams' opinion, Plaintiff continues to suffer from the same problems as when Dr. McWilliams first evaluated him, because he has never received the treatment he needs and the disorder does not just go away on its own. Tr. 290:10-15. His condition worsens with lack of proper treatment and leads to antisocial behavior, which is a secondary diagnosis in his treatment.
Plaintiff arrived at CSH in September of 2012, pursuant to his NGRI status, after serving ten years in prison for events that occurred while he was involuntarily committed *751 pursuant to the NGRI determination. Plaintiff was assigned to Ward 8, the maximum security forensic unit at CSH. Dr. Yaratha, a psychiatrist, was in charge of Ward 8 as his team leader while Plaintiff was so assigned. Dr. Maghakian, also a psychiatrist, sometimes filled in for Dr. Yaratha, and was briefly Plaintiff's team leader from December 2012 through January 2013, and from April through August 2013, at which times Plaintiff was assigned to Ward 6. Dr. Vauter, a psychologist, has been the Director of CSH since November 18, 2014. Prior to this date, Vicki Montgomery, then Director of CSH, advised Plaintiff that DBT was not available at CSH. It was not made available under Dr. Vauter's leadership.
Shortly after Plaintiff's admission to CSH, clinical psychologist and Chief Forensic Coordinator at CSH Dr. Angela Torres evaluated Plaintiff for purposes of submitting an Annual Continuation of Confinement Report regarding Plaintiff's NGRI status.[5] See JE 189. In this report, Dr. Torres opined-as Dr. McWilliams had in 1998 and again at trial in 2018-that Plaintiff's primary diagnosis was BPD, although with Antisocial Traits. Id. at 11. Dr. Cleve Ewell, an Eastern State Hospital staff psychiatrist and Certified Forensic Examiner, provided a second opinion to Dr. Torres' report in December 2012-he also concluded that Plaintiff's primary diagnosis was BPD, with Antisocial Traits. JE 59 at 7. Because they assessed Plaintiff's primary diagnosis as BPD, both Dr. Torres and Dr. Ewell, who testified as Defendants' witnesses, recommended that Plaintiff be treated with DBT. However, Plaintiff was assigned to a facility that did not offer DBT.
Dr. Yaratha testified that, as Plaintiff's treatment team leader, he read Dr. McWilliams', Dr. Torres', and Dr. Ewell's reports that diagnosed Plaintiff with BPD and each recommended DBT. Tr. 334:19-335:7. Dr. Yaratha further testified that Plaintiff's diagnosis at the time he arrived at CSH was BPD, Tr. 333:24-334:2, and that Plaintiff met the criteria for BPD during his stay at CSH, Tr. 334:15-18. However, at the very outset and continuing throughout Plaintiff's stay at CSH, Dr. Yaratha consistently diagnosed Plaintiff with Antisocial Personality Disorder with Borderline Traits. See Joint Exhibits ("JE") 1-2, 4-7, 68. Dr. Yaratha declined to offer DBT to Plaintiff, reportedly because he "determined the benefit did not outweigh the risks." Doc. 201 at 9 (citing Tr. 782-83). Dr. Yaratha testified that he was concerned about Plaintiff's ability to "address past stressors" during DBT, "if he couldn't adequately address current stressors." Tr. 772:1-4. Dr. McWilliams testified that the various inappropriate behaviors exhibited by Plaintiff during his time at CSH-presumably the ones that Dr. Yaratha required Plaintiff to get under control before he would be ready for DBT-were textbook symptoms of Plaintiff's disorder and represented a clear need for DBT rather than a reason to withhold it. Tr. 297:20-298:21. Dr. Yaratha testified that he had no experience or training in administering DBT, but that he knew when it should and could be offered to a patient:
Q. And you're not trained in DBT?
A. No, sir.
* * *
Q. Did you know from your knowledge, training, and experience what DBT was?
*752 A. Yes.
Q. Did you also know when it should and could be used?
A. Yes.
Q. And when it should and should not be offered to a patient?
A. Yes, ma'am.
Q. You did not, yourself, conduct DBT?
A. No, ma'am. I have not a certification in DBT.
Tr. 333:13-14; 770:6-15: see also 770:16-771:17.
At trial, the Court FOUND that psychologists generally have more training in and experience with DBT than psychiatrists, and the testimony of psychologists should outweigh the testimony of psychiatrists as to DBT and the treatment of BPD. In line with this, the Court FINDS credible the opinions given by clinical psychologists Dr. Torres and Dr. McWilliams, as well as the forensic psychiatrist Dr. Ewell, that Plaintiff suffered from BPD, that BPD was his primary diagnosis, that DBT is an appropriate treatment for Plaintiff's disorder, and that group therapy and the administration of antipsychotic drugs is not. Dr. Yaratha was Plaintiff's treatment team leader, and was thus in the best position to get Plaintiff the treatment he needed. However, Dr. Yaratha disregarded the opinions of Drs. Torres, McWilliams, and Ewell, and, despite his lack of experience with BPD and DBT, he did not even consult a clinical psychologist as to whether or not DBT would be an appropriate treatment for Plaintiff. He simply made the decision not to offer it based upon Plaintiff's exceedingly bad conduct, which is a classic symptom of his BPD. Plaintiff can be positive and well-behaved for a time,[6] but his disorder causes him eventually to turn against his treatment providers and caregivers. Instead of understanding that such behavior is a symptom of Plaintiff's BPD and that it is the responsibility of the treatment provider to work through it, Dr. Yaratha used such behavior as grounds to deny Plaintiff the DBT treatment he needed.
Dr. Vauter was Director of CSH and thus Dr. Yaratha's supervisor beginning in November 2014. At trial, Dr. Vauter testified that she relied on the treatment team-in this case led by Dr. Yaratha-to notify her if they required additional resources to treat a patient. Tr. 381:9-11. She testified that while she was made aware of Plaintiff's desire for DBT, it was not something that Plaintiff's treatment team, led by Dr. Yaratha, had requested for Plaintiff. Tr. 383:16-23.[7] Although DBT
*753 was not available at CSH during Plaintiff's stay there, Dr. Vauter further testified that if Plaintiff's treatment team had requested that DBT be provided for him, she is "certain there would be a way" to get a psychologist capable of performing DBT to CSH. Tr. 382:16-19. However, because Plaintiff's treatment team did not recommend DBT, Dr. Vauter delayed her referral of the Plaintiff to Western State Hospital until mid-September 2015.
Dr. Maghakian, the third Defendant named in Count I, occasionally filled in for Dr. Yaratha and was Plaintiff's team leader for a short period of time during the month of January 2013. She testified that Plaintiff had both BPD and Antisocial Personality Disorder, and a report she wrote in August 2013 reflected the same diagnosis.[8] Dr. Maghakian also testified that in her opinion Plaintiff was not a candidate for DBT, because DBT would not cure Plaintiff's "manipulative behavior." Tr. 756:11. In fact, it appears to the Court from Dr. Maghakian's testimony that she may not believe Plaintiff's disorder can be treated at all.
Q: Okay. Even if you had thought that Mr. Farabee was a candidate for DBT and you had started it, would that kind of behavior go away, the manipulative behavior?
A: No. The part of antisocial personality disorder of the deceit, the repeated lying, and the conning others for self-gain is not something that would be treated with DBT.
THE COURT: I thought you previously said you didn't have any experience working with DBT?
THE WITNESS: Well, I personally never delivered it, sir, but I am very familiar with all the components of DBT, and I've read extensively on it. But there are certain personalities or certain ways of a person that can't be changed through therapy. It's just, we are who we are.
Tr. 756:9-21. This statement by Dr. Maghakian conflicts directly with the testimony of Dr. McWilliams, which the Court affords significantly greater weight on this point as discussed previously. At bottom, the Court FINDS Dr. Maghakian's testimony on this issue not credible. Not only did her demeanor change significantly during the cited testimony, but she also contradicted her prior written reports. The Court also notes that Dr. Yaratha, Dr. Maghakian, and Dr. Vauter were all represented by the same counsel in a joint defense effort. It would obviously effect the persuasiveness of their joint defense if Drs. Yaratha and Maghakian opined a different diagnosis upon this key finding. However, considering the limited role she played in Plaintiff's course of treatment, the Court FINDS that it is unlikely Dr. Maghakian had either the information or the ability to decide whether Plaintiff needed or should be offered DBT.
In sum, and in light of all the testimony at trial, it is clear that the mental health and criminal justice systems have failed Mr. Farabee. Had Plaintiff received DBT twenty (20) years ago, he probably would be living a very different life. However, Plaintiff did not receive treatment. Instead he was remanded to prison for exhibiting behavior that is a symptom of his mental illness. Plaintiff had a potential opportunity for rehabilitation when he was released from incarceration and transferred to CSH in 2012. However, although at least two (2) psychologists and a forensic psychiatrist recommended a specific type of therapy to help Plaintiff learn how to develop healthy relationships and eventually be in a position *754 to leave the state system, the members of his treatment team made an affirmative decision not to offer that therapy to Plaintiff. After three (3) years at CSH without receiving the treatment he needed for his BPD, Plaintiff was again incarcerated. At the time of trial, Plaintiff was receiving no mental health treatment, as he was in solitary confinement. Based upon his excellent behavior at trial, it is possible that no treatment at all may be superior to the treatment he received from Dr. Yaratha in Ward 8.
B. Count II
Count II, asserted against Defendants Yaratha and Maghakian, alleges that Plaintiff was forcibly medicated on numerous occasions. The parties stipulated that Plaintiff was given involuntary injections on January 8, 2013, January 16, 2013, March 1, 2013, March 11, 2013, March 16, 2013, July 22, 2013, August 26, 2013, and February 4, 2014.
Defendants argued that Plaintiff was either aggressive or actively smearing feces on certain of the dates in question, and thus that an emergency existed and intervention was required for the safety of Plaintiff and others. The only evidence Plaintiff offered to contradict Defendants' claim that the injections involved exigent circumstances was Plaintiff's own testimony. Although the Court FINDS Plaintiff to be a credible and very intelligent witness, because Plaintiff's mental disease causes him to turn against his health care providers, the Court will not accept his uncorroborated testimony as sufficient in and of itself to impose liability upon any Defendant. Therefore, there is insufficient evidence for the Court to find that the forcible medication of Plaintiff was not necessary for his own safety and the safety of others.
Plaintiff may not have wished to be medicated at each of those times; however, the credible evidence of the defense indicated that there were times when Plaintiff recognized that he was about to act out and requested medication himself. See Tr. 828:25-833:17. This indicates that Plaintiff's condition could and did manifest itself in situations where medication was necessary for the safety of Plaintiff, other patients, and staff, and the Court cannot find that similar exigent circumstances did not exist on the dates of which he complained.
C. Count III
Count III, asserted against Defendant Barnette, alleges unlawful restraint. On November 21, 2013, Plaintiff refused to walk back to the ward from the dining room. He insisted on being transported in a wheelchair. Plaintiff offered into evidence two (2) video recordings that, taken together, show the following progression of events. Plaintiff was sitting in a chair in the middle of the dining hall. Plaintiff reportedly and admittedly was insisting on being transported in a wheelchair. Nurse Barnette left the dining room and later returned with a wheelchair. She then sat down in a chair next to the wheelchair. Plaintiff got up and began walking toward the wheelchair. However, as Plaintiff approached the wheelchair, Nurse Barnette put her foot in the seat of the wheelchair and then put her foot on the arm rest, with her leg blocking the seat of the wheelchair. Nevertheless, Plaintiff positioned himself in front of the wheelchair and lowered himself into the wheelchair. As he did so, Nurse Barnette quickly removed her leg. Plaintiff sat in the wheelchair and quickly wheeled himself away from Nurse Barnette and into the center of the dining room.
However, Nurse Barnette falsely reported that Plaintiff had kicked her. This report was relayed to Dr. Yaratha, who ordered Plaintiff placed in four-point restraints.
*755 According to Dr. Yaratha's testimony, by the time he arrived at the hospital around an hour after he authorized the use of restraints, the restraints had been removed from Plaintiff. Plaintiff also admitted into evidence a debriefing of the restraint incident that was signed by Dr. Yaratha and stated that Plaintiff was removed from the restraints in less than an hour. PE 39. Given this evidence, the Court FINDS that Plaintiff was in four-point restraints as a result of the alleged "kicking incident" for just under an hour. It was later determined that Nurse Barnette's allegation that Plaintiff had kicked her was false, and Nurse Barnette was discharged from her employment with CSH as a result of this incident.
Nurse Barnette testified that she had no control over whether Plaintiff was placed in restraints. However, the testimony throughout the trial indicted that when Plaintiff became overly aggressive he would be placed in restraints or involuntarily medicated. Therefore, the Court FINDS it can reasonably be inferred that Nurse Barnette was aware that Plaintiff would suffer some form of punishment as a result of her false accusation.
D. Count IV
Count IV, asserted against Defendants Vauter, Yaratha, and Wolf, alleges failure to protect and retaliation. Plaintiff alleges that these three (3) Defendants failed to protect him from multiple physical attacks by another patient, Justin Evans, and that Drs. Yaratha and Wolf actively encouraged such attacks.
Plaintiff and Evans have known each other for twenty (20) years. They have met in both mental hospitals and prisons. They do not like each other and have been enemies for virtually the entire time they have known each other. However, there were no physical altercations between Plaintiff and Evans until they were on Ward 8 together in 2015.
During the summer of 2015, Evans attacked Plaintiff on at least three (3) occasions. On July 23, Evans attacked Plaintiff while he was watching television, hitting Plaintiff and biting him.[9] Plaintiff reported the incident to his treatment team, including Dr. Yaratha and Dr. Wolf, as well as to Dr. Vauter. On July 24, Evans was transferred from Ward 8 to Ward 4 by order of Dr. Sheneman, who was the supervising psychiatrist for multiple wards including Ward 8. JE 233. However, Evans was transferred back to Ward 8 by the emphatic order of Dr. Yaratha on July 28.[10] On July 30, Evans again attacked Plaintiff, this time cutting into Plaintiff's head with a sharp object. Hospital staff intervened to stop the attack, and Plaintiff also again complained to Drs. Yaratha, Wolf, and Vauter and asked for himself and Evans to be placed on separate wards. In a letter dated August 4, 2015, Dr. Vauter addressed Plaintiff's complaints about Evans by recommending that he "discuss [his] feeling with the Treatment Team [as] they are best positioned to respond to [his] concerns." PE 74. Although Dr. Yaratha implied that he took steps to separate Plaintiff and Evans within Ward 8 after the July 30 attack, Tr. 846:17-848:21, the two (2) patients were not separated. In fact, it appears from video footage and Dr. Yaratha's testimony that during this period they were housed on the same hall with only one room in between them, although it was a large ward designed to house *756 more than twenty (20) patients. Around 3:00 in the morning on August 13, Evans charged into Plaintiffs room and attacked him while he slept. Plaintiff sustained injuries to his right eye, head, neck, and chest, and sustained bite injuries to his right leg. All three (3) attacks detailed by Plaintiff at trial were corroborated by both video footage from CSH and testimony from Evans.
Plaintiff testified that Evans told him that Dr. Yaratha and Dr. Wolf encouraged Evans to attack Plaintiff because of the way Plaintiff treated the staff on Ward 8 and the complaints that Plaintiff wrote. Plaintiff also testified that he heard Dr. Yaratha and Dr. Wolf conspiring to get even with Plaintiff. Plaintiff testified that he was in the day room and that Dr. Yaratha and Dr. Wolf were in the nurse's station when he overheard the conversation.
Evans testified that both Dr. Yaratha and Dr. Maghakian (not Dr. Wolf) had encouraged him to attack Plaintiff, although Evans' testimony focused primarily on interactions with Dr. Yaratha. Evans explained that the encouragement consisted of subtle reminders that Evans was dependent on Dr. Yaratha for everything from food to clothes. Tr. Ex. 254; Dep. 12:2-19. Evans testified that after attacking Plaintiff, he would receive gifts of extra food, alcohol, and drugs. Evans testified that these items were given to him by staff members, but with hints that they were courtesy of Dr. Yaratha. Tr. Ex. 254; Dep. 22:22-23:8. It is undisputed that while Evans was on Ward 8, he did obtain and use alcohol and drugs. One evening Evans was clearly intoxicated. The police were called to investigate. Although the police did not find alcohol, they did find drugs. Tr. 400:7-8. The source of the contraband was never determined.
It does not appear that the personnel on Ward 8 cooperated with either the investigation by Dr. Vauter or the police. It is also notable that no staff employee from Ward 8 was called as a defense witness, except Nurse Barnette who is a defendant. Neither was Dr. Wolf called as a defense witness after the Court sustained her motion for judgment as a matter of law. And Dr. Yaratha testified that he did not recall being interviewed regarding the investigation.[11] In late August 2015, shortly after the alcohol and drugs were exposed and the several beatings had been inflicted upon the Plaintiff, Ward 8 was closed. Tr. 561:23-25. Dr. Vauter stated that Ward 8 was changed to a women's ward, and although Dr. Yaratha had previously required that the Plaintiff and Evans be confined in Ward 8 they were necessarily transferred elsewhere within CSH upon Ward 8 closing. Weeks later, on September 10, 2015, Plaintiff was transferred to Western State Hospital. Around the same time, Dr. Wolf left the employ of the Commonwealth and Evans was discharged from state custody but later arrested.[12] Tr. 478:11-12. Dr. Yaratha departed CSH a few months later, in January 2016. JE 70 ¶ 5.
The Court FINDS that Evans' testimony was credible. Evans does not like Plaintiff, *757 and the two (2) have been enemies for twenty years. Nevertheless, he corroborated Plaintiff's testimony, including the facts that Evans was given drugs, alcohol, extra food, and other incentives to attack Plaintiff. Evans had an insightful understanding of his position relative to that of Dr. Yaratha. Evans claimed that he understood that Dr. Yaratha was manipulating him, while maintaining plausible deniability. Evans testified that several years earlier he had formerly been in Plaintiff's shoes-that is, he had been the victim as opposed to the beneficiary of Dr. Yaratha's manipulation. Evans knew his welfare and special privileges were dependent upon Dr. Yaratha's largesse.
As mentioned above, after the first physical attack by Evans on Plaintiff, Evans was moved to Ward 4 by Dr. Sheneman, Dr. Yaratha's supervisor. However, four (4) days later Dr. Yaratha had Evans returned to Ward 8. Tr. 840:08-842:24; JE 234. There is no corroborated evidence that Evans was causing a problem on Ward 4. The Court specifically gave counsel for Defendants, including Dr. Vauter who is the present director of CSH, Evans' waiver to obtain his medical records during the period of July 24 through July 28, 2015, while Evans was on Ward 4. However, no records were proffered to the Court to support Dr. Yaratha's uncorroborated claim that he moved Evans because he was causing problems on Ward 4. Moreover, Evans testified that he told Dr. Yaratha that he wished to return to Ward 8 in order to get at Plaintiff, and on July 28 Dr. Yaratha emphatically ordered his return to Ward 8. Tr. Ex. 254; Dep. 40:3-14; see also supra note 10.
Dr. Yaratha testified at length as to the measures taken to "keep [Plaintiff and Evans] away from each other to try to separate them from becoming aggressive or aggress upon each other." Tr. 848:19-21; see Tr. 848:10-851:2. However, and despite the fact that there were only three patients on Ward 8, a facility designed to accommodate over twenty (20) patients, at the time of the August 13, 2015, nighttime attack, Mr. Evans was assigned a bedroom only one room away from Plaintiff. Tr. 862:22-24. Plaintiff proffered sufficient evidence that Dr. Yaratha failed to protect him from Evans and made it easier for Evans to attack him, and persuasive evidence that Dr. Yaratha's actions encouraged Evans to attack Plaintiff on August 13, 2015 and earlier. The Court also notes that evidence at trial showed that Ward 8 was closed shortly after this incident, despite Dr. Yaratha's testimony that neither Evans nor Plaintiff could be moved to any other ward at CSH, even for Plaintiff's own safety. See Tr. 847:2-11.[13]
*758 Count IV comes down to credibility. Dr. Yaratha's testimony was inconsistent and conflicting in many important respects, and the Court therefore FINDS that Dr. Yaratha's testimony was not credible. To the contrary, and as stated above, the Court FINDS that Evans' testimony and Plaintiff's testimony were credible, and that a significant amount of circumstantial evidence was admitted at trial which corroborates their testimony. Plaintiff's testimony against Dr. Wolf, however, is largely uncorroborated. Therefore, at trial and on Dr. Wolf's motion, the Court GRANTED judgment as a matter of law in favor of Dr. Wolf as to Count IV. Dr. Vauter mistakenly put her trust in Plaintiff's treatment team, led by Dr. Yaratha. While this is questionable, Dr. Vauter did, albeit belatedly, close Ward 8 and transfer Plaintiff to Western State where DBT was available.
II. CONCLUSIONS OF LAW
The treatment of an involuntarily committed patient is governed by the Fourteenth Amendment to the United States Constitution. In Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Supreme Court found that such individuals have a constitutional right to adequate medical care, safe conditions, and freedom from bodily restraint, among other things. Id. at 315-16, 102 S.Ct. 2452. The Youngberg Court held that the relevant standard governing such claims is the professional judgment standard:
[T]he decision, if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.
Id. at 323, 102 S.Ct. 2452.
The Court explained that this standard is more easily met than the deliberate indifference standard applied to prisoners' constitutional claims, because "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." Id. at 321-22, 102 S.Ct. 2452.
The Youngberg Court did not hold or even imply that the testimony of professionals is ipso facto more credible than the testimony of involuntarily committed mental health patients. Nor did that Court establish a hierarchy of professionals, such that the judgments of individuals with certain qualifications are automatically afforded more weight than those of individuals with different qualifications. The credibility of witnesses and the weight to be given to a professional's opinion are matters for the trier of fact to decide. Accordingly, the Court notes at the outset of its Conclusions of Law that the theme which pervades the arguments made by Defendants-namely, that the Court should ipso facto believe doctors over mental health patients, and should defer to psychiatrists over psychologists-is unavailing.
A. Count I
Count I alleges that Defendants Yaratha, Maghakian, and Vauter failed to provide Plaintiff with DBT, in violation of his constitutional right to adequate medical care. Given Plaintiff's position as an involuntarily committed patient, the relevant standard that governs this claim is the professional judgment standard established *759 in Youngberg and outlined above. Plaintiff is required to prove this claim by a preponderance of the evidence.
Dr. Yaratha had the reports of Dr. McWilliams and Dr. Torres, psychologists, and Dr. Ewell, a psychiatrist, each of whom diagnosed Plaintiff with BPD and both of whom recommended that Plaintiff receive DBT to treat his BPD. Despite the fact that Dr. Yaratha had no training in DBT, he decided that Plaintiff was not a candidate for DBT. As a result, Plaintiff essentially received no proper treatment during his time at CSH. Defendants emphasized at trial that Plaintiff was offered "multiple treatment modalities," Tr. 675:22, including medication, group therapy,[14] and the occasional meeting with a psychologist. However, the very nature of Plaintiff's illness makes him unlikely to avail himself of these treatments. Dr. Yaratha was faced with a patient who wanted treatment and begged for treatment in the form of DBT, which is the exact form of treatment that had been repeatedly recommended for Plaintiff by psychologists trained and experienced in DBT. Nevertheless Dr. Yaratha, who is not a trained psychologist, chose to provide Plaintiff with what amounted to "one size fits all" treatment, never asking Dr. Vauter to obtain a psychologist trained in DBT to consult with him or to treat Plaintiff. Dr. Yaratha's approach was, in essence, to require Plaintiff to overcome his BPD symptoms on his own in order to earn eligibility for the treatment he needed. Then, if Plaintiff could cure himself, he would be transferred to a civil hospital where Plaintiff could receive the DBT treatment that he had needed for decades.
Plaintiff's allegations under Count I amount to a denial of medical care claim.[15] Although Defendants Yaratha, Vauter, and Maghakian acknowledge that such a claim is governed by the professional judgment standard, they argue that it must be supported by expert testimony "establish[ing] the standard of care and prov[ing] any substantial departures from that standard." Doc. 201 at 4. For support, these Defendants cite to Patten v. Nichols, 274 F.3d 829 (4th Cir. 2001), in which they note that the Fourth Circuit "granted summary judgment in favor of defendants after finding the plaintiff's expert testimony was insufficient to show a substantial departure from the standard of care." Doc. 201 at 4. While that was the outcome of the Patten Court's decision, that Court also noted that "the question is not whether an expert's report recites the requisite legal terms of art." Patten, 274 F.3d at 844. Rather, "the question is whether the evidence provides a factual basis upon *760 which [the trier of fact] could reasonably find for the [Plaintiff.]" Id.
In this case, the question is whether the evidence presented at trial-taken as a whole-provides a factual basis upon which the Court can find that the decision not to provide Plaintiff with DBT was "so completely out of professional bounds as to make it explicable only as an arbitrary, nonprofessional one." Id. at 845 (quoting United States v. Charters, 863 F.2d 302, 313 (4th Cir. 1988) ). The Court FINDS that the evidence presented at trial and as explained in the Court's Findings of Fact demonstrates that Dr. Yaratha failed to take any reasonable steps to provide Plaintiff with the treatment he required, against the recommendations of professionals whom the Court has determined are more qualified to make such a judgment. As Plaintiff's treatment team leader, Dr. Yaratha was the individual best positioned to get Plaintiff the treatment he needed, but he made the affirmative decision not to request that DBT be made available to Plaintiff. The Court FINDS that this decision by Dr. Yaratha is not within the realm of professional judgment and thus violated Plaintiff's constitutional right to the provision of adequate medical care and that he was damaged as a result. Accordingly, the Court GRANTS judgment in favor of Plaintiff against Dr. Yaratha as to Count I.
Because the Court has found that Dr. Vauter relied on Plaintiff's treatment team to recommend what resources were necessary for his medical care and later closed Ward 8 and transferred him to Western State Hospital, and that the evidence regarding Dr. Maghakian's role in treating Plaintiff was limited and largely uncorroborated, the Court FINDS that the evidence is insufficient to establish a substantial departure from the standard of care by these two (2) individuals. Accordingly, the Court GRANTS judgment in favor of Drs. Vauter and Maghakian regarding Plaintiff's claims that they failed to provide Plaintiff with DBT as charged in Count I.
B. Count II
Count II alleges that Defendants Yaratha and Maghakian forcibly medicated Plaintiff, in violation of his constitutional right to be free from bodily restraint. Again, the relevant standard that governs this claim is the professional judgment standard. Plaintiff is required to prove this claim by a preponderance of the evidence.
Drs. Yaratha and Maghakian claim that they were using their professional judgment to determine whether Plaintiff's behavior warranted the use of forced medication to protect Plaintiff, other patients, and staff. Plaintiff recognized on occasion that he required medication to control his anger or anxiety. While the evidence is conflicting, Plaintiff has not met his burden of proof as to Count II, and the Court GRANTS judgment in favor of Dr. Yaratha and Dr. Maghakian as to Count II.
C. Count III
Count III alleges that Defendant Barnette made a false report that resulted in his being restrained, in violation of his constitutional right to be free from such restraint. The relevant standard that governs this claim is the professional judgment standard, and the burden is on Plaintiff to prove this claim by a preponderance of the evidence.
It is difficult to consider making a false report as within the realm of professional judgment. Nurse Barnette made a false claim against Plaintiff, a vulnerable patient in a mental facility, and, as could reasonably be expected given the conditions prevailing in Ward 8, her accusations resulted in Plaintiff being placed in restraints upon the order of Dr. Yaratha. Plaintiff is no stranger to restraints. Plaintiff was incarcerated for ten (10) years prior to coming *761 to CSH. Plaintiff was sometimes restrained for safety reasons. Occasionally, Plaintiff even requested restraints, because he knew he might hurt himself or someone else. However, this time, it was not the routine application of restraints that one experiences in prison. Nor was it the emergency application of restraints that is sometimes necessary in a mental hospital. This time, Plaintiff, who as a result of his mental condition had trouble trusting people, was placed in restraints because a nurse, who was entrusted with caring for Plaintiff, fabricated a report against him.
Plaintiff was released from restraints in an hour. However, the report remained in his medical records. Dr. Yaratha even erroneously used this incident as one of his reasons to continue Plaintiff's commitment, and in another annual report internal to CSH as well. JE 5 at 8; JE 6 at 6. The Court FINDS that Nurse Barnette's false report violated Plaintiff's constitutional right to freedom from restraint, and that Plaintiff was damaged as a result.
D. Count IV
Count IV alleges that Defendants Yaratha, Wolf, and Vauter failed to protect Plaintiff from being physically attacked by a fellow patient on multiple occasions, in violation of his constitutional right to be housed in safe conditions. The relevant standard that governs this claim is the professional judgment standard, and the burden is on Plaintiff to prove this claim by a preponderance of the evidence.
Plaintiff was brutally attacked by a fellow patient on at least three (3) occasions while housed on Ward 8 during July and August of 2015. The fellow patient, Justin Evans, has testified that Dr. Yaratha encouraged him to attack Plaintiff, by offering special treatment, including supplying Evans with drugs and alcohol. The Court has found Evans' testimony credible, and has also noted that the records produced (and not produced) at trial, as well as the two men's hostile yet non-physical history, corroborate this testimony. Dr. Yaratha also cited Plaintiff's alleged kicking of Nurse Barnette as a reason to continue Plaintiff's confinement in two annual reports submitted in October 2014, even though the video evidence clearly showed Plaintiff did not kick, and even though she was discharged shortly after the November 2013 incident for fabricating the allegation.[16] JE 5 at 8; JE 6 at 6.
After failing to prevent Evans from attacking Plaintiff and then ordering Evans back to Ward 8 in close proximity to Plaintiff, Dr. Yaratha intentionally provided Evans with greater access to Plaintiff. He then suggested to Evans that he might be rewarded rather than punished for attacking Plaintiff, which clearly represents a complete departure from professional judgment. As the Court noted with respect to Count III, there is no way in which such actions could be considered to be even within the realm of professional judgment. The Court FINDS that Dr. Yaratha has violated Plaintiff's constitutional right to safe conditions in his Ward 8 and he was thereby damaged. The Court therefore GRANTS judgment for Plaintiff against Dr. Yaratha as to Count IV.
For the reasons stated supra, the Court GRANTED judgment as a matter of law in favor of Dr. Wolf at the close of Plaintiff's evidence.
III. DAMAGES
Section 1983 creates a remedy against every state actor who violates any *762 person's federal constitutional or statutory rights. Kalian v. Fletcher, 522 U.S. 118, 123, 118 S.Ct. 502, 139 L.Ed.2d 471 (1997). A court determining relief for a prevailing plaintiff must award compensatory damages, if proven, and may in its discretion award punitive damages and injunctive relief. See Smith v. Wade, 461 U.S. 30, 51-52, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983). "[T]he level of damages [in § 1983 cases] is ordinarily determined according to principles derived from the common law of torts." Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 306, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986). Punitive damages are appropriate where the defendant has demonstrated "reckless or callous disregard for the plaintiff's rights" or committed "intentional violations of federal law." Smith, 461 U.S. at 51, 103 S.Ct. 1625.
Plaintiff requests both compensatory and punitive damages, as well as injunctive relief.
A. Count I
As to Count I, Plaintiff asks for compensatory damages in the amount of $500,000 and punitive damages in the amount of $350,000, with interest accruing from April 1, 2013. In support of this request, Plaintiff notes, and the Court agrees, that the failure to provide Plaintiff with DBT has resulted in incalculable damage to Plaintiff. However, that failure began decades ago, and the Defendants in this case are only on trial for their conduct between 2012 and 2015. Accordingly, the Court believes that an award of compensatory damages in the amount of $100,000 is appropriate, and GRANTS judgment in that amount against Dr. Yaratha as to Count I. The Court does not believe Plaintiff has presented sufficient evidence to support an award of punitive damages on Count I.
Plaintiff also asks the Court to issue an injunction requiring Dr. Vauter to provide DBT to Plaintiff, if and when he is recommitted to any facility under her control. Plaintiff asks the Court to retain jurisdiction over the case in order to modify its award of injunctive relief, in case Plaintiff's condition changes or other appropriate therapy techniques become available. Counsel for Defendants Yaratha, Vauter, and Maghakian argue that it would be inappropriate for the Court to grant the relief Plaintiff requests, because doing so would "require the Court to choose that DBT is the most appropriate treatment method and order its provision, [which] is precisely what the professional judgment standard precludes." Doc. 201 at 28.
"There can be no doubt that a district court has power to grant injunctive relief where there has been a deprivation of civil rights." Sewell v. Pegelow, 291 F.2d 196, 198 (4th Cir. 1961), disapproved of on other grounds by Dist. of Colum. v. Carter, 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973). The Court agrees with counsel for Defendants that granting injunctive relief along the lines requested requires the Court to find that DBT is the most appropriate treatment method for Plaintiff. And the Court has found the evidence presented at trial to be more than sufficient to support the finding that Plaintiff needs DBT to treat his BPD, and has needed it since he was a young man. Records obtained from the Department of Corrections pertaining to Plaintiff's treatment history since late 2012 show that, even in prison, his treatment providers have recognized the need for and have offered DBT. Moreover, the Court has found that Dr. Yaratha's decision not to provide DBT fell completely outside the bounds of professional judgment, and therefore that decision is not entitled to the deference which defense counsel insists is mandated by the professional judgment standard.
*763 Accordingly, the Court GRANTS Plaintiff's request for injunctive relief and ORDERS Dr. Vauter to make available to Plaintiff DBT treatment, if and when Plaintiff is committed to an institution that is under her control. The Court will retain jurisdiction over this matter for purposes of modifying its award of injunctive relief, in the case that Plaintiff's condition changes, or new therapeutic or medical techniques for treatment of his condition become available.
B. Count III
As to Count III against Defendant Barnette, Plaintiff seeks compensatory damages in the amount of $100,000 and punitive damages in the amount of $100,000, with interest accruing from November 21, 2013. In support of the amount of damages sought, Plaintiff cites Ziemba v. Armstrong, 433 F.Supp.2d 248 (D. Conn. 2006), in which the Court held that a damage award of $100,000 to an inmate who was attacked while in four-point restraints was not excessive. In that case, a guard attacked the inmate while he was restrained, digging his knee into the inmate's back and using a nerve compression technique on his head to inflict severe pain-the inmate was left in restraints for twenty-two (22) hours. See id. at 252. The Court held that these facts supported the jury's award, and added that the plaintiff likely suffered significant psychological injury that supported the size of the award as well. Id. at 253.
Although the Court has found that Nurse Barnette violated Plaintiff's rights by making a false report that led to Plaintiff's improper restraint, Plaintiff has not presented sufficient evidence to support an award of compensatory damages in the amount he seeks. The Court does not discount the discomfort and mental anguish suffered as a result of Plaintiff's being physically restrained against his will and for no good reason. The incident also likely had significant psychological effects on Plaintiff, reinforcing his already disordered thinking as to why he cannot trust anybody. But given that the restraints were left on for only approximately one (1) hour, the Court FINDS that a compensatory damages award that is significantly less than the one Plaintiff requested is appropriate. Accordingly, the Court GRANTS Plaintiff judgment against Defendant Barnette for compensatory damages in the amount of $25,000.
The Court agrees with Plaintiff that punitive damages are appropriate in this case. The Court FINDS that Nurse Barnette's false report was made in reckless disregard of Plaintiff's constitutional right to be free from bodily restraint. Nurse Barnette knew or should have known that reporting that Plaintiff had kicked her would lead to his being placed in restraints or equivalent punishment. She also knew that Plaintiff had not in fact kicked her, and thus did not pose any risk to anyone's safety meriting the imposition of further punishment. Moreover, and as Plaintiff highlights in his trial brief, this incident was so far outside the bounds of professional judgment that Nurse Barnette's employment with CSH was terminated because of it, and she was given a reprimand by the Board of Nursing. Accordingly, the Court will GRANT judgment against Defendant Barnette for punitive damages in the amount of $10,000.
C. Count IV
As to Count IV, Plaintiff seeks compensatory damages in the amount of $750,000 and punitive damages in the amount of $350,000. In support of this request, Plaintiff makes the following argument:
Psychologists, psychiatrists, and other health providers, are looked to by society to protect and heal, not to "sadistically *764 torture" persons committed to their care. All the more so when such doctors are public servants charged with responsibility for caring for the most vulnerable members of our society, the mentally ill. It is hard to imagine being in the position [Plaintiff] was in, wherein his treatment team leader was affirmatively encouraging a bully almost twice his size to pummel him for weeks at a time. The 3:00 a.m. attack on August 13, 2015 is the stuff of horror movies, yet Drs. Yaratha and Vauter did not so much as move [Plaintiff] and Evans to separate wards after that incident.... Every case is unique, but this case cries out for full compensation and a fully adequate punitive award.
Doc. 199 at 29.
The Court agrees with Plaintiff that the events alleged in Count IV and proven at trial are horrifying and caused Plaintiff severe physical and psychological damage. The Court will GRANT judgment for Plaintiff against Dr. Yaratha for compensatory damages in the amount of $200,000. The Court further agrees with Plaintiff that punitive damages are warranted given the egregious rights-violating conduct displayed by Dr. Yaratha toward Plaintiff. Dr. Yaratha's manipulative interactions with Evans, his ordering Evans back to Ward 8 after his supervisor had transferred him to Ward 4, and his placing Evans in very close proximity to Plaintiff despite low ward population all support the award of punitive damages. Accordingly, the Court GRANTS judgment for Plaintiff against Dr. Yaratha for punitive damages in the amount of $50,000.
D. Interest
Interest on the $300,000 in compensatory damages awarded against Dr. Yaratha on Counts I and IV shall accrue from July 28, 2015, which is the date that Dr. Yaratha ordered Evans to be transferred back to Ward 8 where Plaintiff was housed, at the then prevailing judgment rate. Interest on the $25,000 in compensatory damages awarded against Nurse Barnette on Count III shall accrue from November 21, 2013, which is the date of her false report against Plaintiff, at the then prevailing judgment rate. Interest on the $50,000 in punitive damages awarded against Dr. Yaratha on Count IV, and the $10,000 in punitive damages awarded against Nurse Barnette on Count III, shall accrue from the date of the judgment at the judgment rate.
IV. CONCLUSION
As Dr. McWilliams accurately predicted, the Plaintiff has never received appropriate treatment for his curable mental disease of BPD. When in the course of his treatment he exhibits classic symptoms of BPD, such as aggressive behavior toward others, including his mental health care providers, and self harm, such behavior has been used as a reason to withhold treatment. Until his mental health care providers give him treatment as opposed to punishment for such behavior, he may never be cured, as the last two decades illustrate.
As Plaintiff has prevailed on certain claims brought pursuant to 42 U.S.C. § 1983, any request for attorney's fees pursuant to 42 U.S.C. § 1988 should be made within sixty (60) days from the date of entry of this Order. Any such request should provide all information required for the Court to determine the reasonableness of fees.
The Clerk is REQUESTED to send a copy of this Order to all counsel of record.
It is so ORDERED .

Plaintiff made clear in his closing argument that he is proceeding in Count I under the exclusive theory that he was not provided Dialectical Behavior Therapy and that this constitutes a failure to provide medical care in violation of his constitutional rights. Plaintiff chose not to incorporate into Count I his claims regarding the attacks by fellow patient JE, which are instead confined to Count IV.

Dr. McWilliams was not the first clinician to diagnose Plaintiff with BPD. Dr. McWilliams' report states that Plaintiff "has been most consistently diagnosed as suffering from borderline personality disorder," and that his interview with Plaintiff rendered findings "essentially consistent with past diagnostic reports indicating strong borderline personality tendencies," PE 58 at 3.

"Mr. Farabee may well meet legal criteria for an NGRI defense. Given that, please allow the following advice. To hospitalize this patient until he is deemed 'stable' may well result in a life sentence to a psychiatric hospital. For reasons described above, long-term placement in institutional settings virtually never prove[s] useful for treatment of borderline personality disorder. In almost all cases, the frequency and intensity of self-destructive behavior worsens. Furthermore, emotional dependency on persons within the institution tends to lead patients to sabotage discharge efforts (despite their repeated claims of wanting discharge). I should also point out that pharmacological interventions have no proven utility for this disorder. Their benefit usually stems from sedative side effects (as a sleeping or sleepy patient is less likely to act out).... Clinically, Mr. Farabee requires much more intensive and sophisticated therapy for childhood abuse/neglect issues than he is currently receiving.... Bluntly, he is quite unlikely to find such therapy within a state hospital." PE 58 at 6.

"If someone starts to love me-how about if I call you this? How about if I come home late? What if I cheated on you? What if I cut myself? Do you still love me? Often they find-eventually, the person says I don't want anything to do with you anymore ...." Tr. 274:9-13.

This report was prepared for and submitted to the Williamsburg/James City County Circuit Court, pursuant to Virginia Code Section 19.2-182.5. Dr. Torres also testified at the hearing to continue Plaintiff's confinement, repeating her recommendation of DBT treatment. See PE 192.

See, e.g., Tr. 333:8-10 (Dr. Yaratha's direct examination by Plaintiff) ("Q. And you found Mr. Farabee, at least early on, to be very motivated to get through the NGRI program? A. Yes, sir."); JE 7 at 9-10 (report authored by Dr. Yaratha in January 2015 recommending civil transfer) ("He has made no attempt at self harm in some time-since his visit to the Dinwiddie jail for a court hearing, which was over thirty days ago. He has made tremendous improvements in the past month with this recent change in environment (move to 39-1). He has been overall cooperative with staff redirection. He has not been in restraints or seclusion and has met with the treatment team on various occasions since his move to 39-1. This is in contrast to not meeting with the treatment team in the previous six months. He has asked about the next step in the NGRI process, which is a change for him.").

"To the best of my recollection, [Plaintiff] never requested that I make DBT available. When I was briefed on the issue after I began, I was told that he had requested DBT previously and that his treatment team had advised that he was not an appropriate candidate at that time and that the previous director had addressed that request and complaint. I did not receive a complaint directly from him regarding this." Id. Dr. Vauter did, however, receive complaints from Plaintiff regarding the attacks detailed in Count IV, as well as requests to be transferred away from Ward 8. See Tr. 386:16-387:6.

In at least one (1) Medical Treatment and Detention Petition filed with the Dinwiddie General District Court, however, Dr. Maghakian cited only Plaintiff's BPD as the basis for her request that the Court authorize the specified treatment. See PE 13.

Plaintiff testified that Evans also attacked him later that same day. For ease of reference, the Court will refer to both attacks on July 23 collectively as the "first attack" or the "July 23 attack."

"Transfer to 35-8 ... TODAY/ NOW." JE 234 (emphasis in original).

Tr. 871:24-872:7 (cross examination of Dr. Yaratha by Plaintiff).
Q. Dr. Yaratha, do you recall Dr. Vauter testifying that she never could find the source of the drugs and alcohol getting into Central State Hospital?
A. Yes.
Q. When she was trying to find the source of the drugs and the alcohol, did she interview you?
A. I don't recall that.
Q. Did her investigators interview you?
A. I'm sure they did. I don't recall if or when.

At the time of this trial, Evans was in state custody.

Plaintiff was later transferred to Western State Hospital, where DBT was available, although this relocation was short-lived due to the Commonwealth's Attorney's decision to pursue revocation proceedings against Plaintiff. Plaintiff was convicted of two (2) counts of Malicious Wounding in 2000 and sentenced to twenty (20) years imprisonment with sixteen (16) years and eight (8) months suspended, conditioned on a period of twenty (20) years good behavior. In 2004, Plaintiff was convicted on a separate Malicious Wounding charge (brought in 2002) and sentenced to ten (10) years Imprisonment. After serving his sentence on the 2002 charge, he was admitted to CSH in September 2012, as detailed above. In the spring of 2015, the Commonwealth's Attorney brought revocation proceedings in the Dinwiddie Circuit Court regarding the suspended sentence imposed in 2000. The prosecutor alleged that Plaintiff had violated his good behavior condition by assaulting CSH staff members. The assault charge was eventually nolle prossed because witnesses stated the Plaintiff never struck a staff member as alleged, but instead of dropping the revocation proceedings, the Commonwealth's Attorney decided to proceed on a different allegation-namely, the 2004 conviction for Malicious Wounding. The Dinwiddie Circuit Court found that the 2004 conviction was a violation of Plaintiff's good behavior and thus grounds for revocation; the Court sentenced Plaintiff to an active term of incarceration of six (6) years and eight (8) months. Plaintiff has been housed in the Virginia Department of Corrections since the fall of 2015.

The various groups that Defendants reportedly offered to Plaintiff as treatment were: Substance Abuse, Men's Issues, Cooperative Interaction, Anger Management, Handling Hassles, Music Therapy, Stress Management, Leisure Awareness, Music Relaxation, Well & Fitness, Health Awareness, and Self-Management Coping Skills. JE 241.

The Court notes preliminarily that Section 53.1-32 of the Virginia Code states, "It shall be the general purpose of the state correctional facilities to provide ... medical and mental health care and treatment" to the prisoners committed to such facilities. Va. Code Ann. § 53.1-32(A) (West 2018). The statute further directs that "[i]n no event shall any prisoner be denied medically necessary service due to his inability to pay." Id. Although Plaintiff was not a prisoner during the time period relevant to this lawsuit, and although he did not bring his claims under the Virginia statute, the Court takes judicial notice of the statute and the duty it imparts to the Defendants in this case. Any breach of this duty, while insufficient to afford Plaintiff the relief he seeks, is a factor to be considered in determining whether the Defendants violated Plaintiff's constitutional rights in this case, by denying him access to DBT as alleged in Count I and by failing to protect him from Evans' attacks as alleged in Count IV.

Dr. Yaratha did not report the alleged kicking incident in his request for civil transfer submitted in January 2015. JE 7.