**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-1952**

BRIAN D. FARABEE,

      Plaintiff - Appellee,

      v.

DR. SRIDHAR YARATHA, Psychiatrist / M.D.; REBECCA A. VAUTER, Psy.D.,
Director / CEO,

           Defendants – Appellants,

      and

VICKI MONTGOMERY, CSH Director / CEO; JIM BELL, CSH Forensic unit
director; JOHN L. PEZZOLI, Commissioner of the Dep't of Behavioral Health &
Developmental Services (DBHDS); RONALD O. FORBES, Director of Medical
Dep't at CSH; CYNTHIA MAGHAKIAN, M.D. / Psychiatrist, at CSH; DWIGHT
RICHARD DANSBY, Attorney of Plaintiff; ANGELA N. TORRES, Licensed
Clinical Psychologist (LCP); NITAYA BARNETTE, Licensed Practical Nurse;
MARKITA WOLF, Clinical Psychologist,

           Defendants.

**No. 18-7062**

BRIAN D. FARABEE,

      Plaintiff - Appellant,

      v.

DR. YARATHA, Psychiatrist / M.D.; REBECCA A. VAUTER, Psy.D., Director / CEO; CYNTHIA MAGHAKIAN, M.D. / Psychiatrist, at CSH; NITAYA BARNETTE, Licensed Practical Nurse,

Defendants – Appellees,

and

VICKI MONTGOMERY, CSH Director / CEO; J. BELL, CSH Forensic unit director; JOHN L. PEZZOLI, Commissioner of the Dep't of Behavioral Health & Developmental Services (DBHDS); RONALD O. FORBES, Director of Medical Dep't at CSH; DWIGHT RICHARD DANSBY, Attorney of Plaintiff; ANGELA N. TORRES, Licensed Clinical Psychologist (LCP); MARKITA WOLF, Clinical Psychologist,

Defendants.

_____

Appeals from the United States District Court for the Eastern District of Virginia, at Norfolk.  Henry Coke Morgan, Jr., Senior District Judge.  (2:14-cv-00118-HCM-DEM)

_____

Argued:  October 30, 2019                    Decided:  February 6, 2020

_____

Before DIAZ, HARRIS, and RUSHING, Circuit Judges.

_____

Affirmed in part, reversed in part, vacated in part, and remanded by unpublished opinion. Judge Diaz wrote the opinion, in which Judge Harris and Judge Rushing joined.

_____

**ARGUED:**  Lynn Jones Blain, HARMAN, CLAYTOR, CORRIGAN & WELLMAN, Richmond, Virginia, for Appellants/Cross-Appellees.  Jeremiah A. Denton III, JEREMIAH A. DENTON III, P.C., Virginia Beach, Virginia, for Appellee/Cross-Appellant.  **ON BRIEF:**  Leslie A. Winneberger, George A. Somerville, HARMAN, CLAYTOR, CORRIGAN & WELLMAN, Richmond, Virginia, for Appellants/Cross-Appellees.

_____

Unpublished opinions are not binding precedent in this circuit.

DIAZ, Circuit Judge:

Brian Farabee, a former patient at Central State Hospital, brought this 42 U.S.C. § 1983 suit against several hospital employees. He alleged that his due process rights were violated because he was denied mental health treatment that he needed, forcibly medicated, and unreasonably restrained, and because hospital staff encouraged another patient to attack him. Farabee and two of the defendants—Drs. Sridhar Yaratha and Rebecca Vauter—now appeal from the district court's decision after a bench trial. Yaratha challenges the court's rulings against him on two claims. Vauter appeals from an injunction entered against her. And Farabee contends that his forced-medication claim was improperly denied.

For the following reasons, we reverse the district court's judgment as to Farabee's claim that he was denied necessary treatment and remand for entry of judgment in favor of Yaratha. We also vacate the injunction entered against Vauter. We otherwise affirm the district court's judgment.

I.

A.

Farabee has a long history of mental illness.[1] Since he was thirteen years old, he has been almost continually confined in hospitals or correctional facilities. When he was

---

[1] The district court detailed this history in its opinion following the bench trial. *See* J.A. 1190–1220. We accept the court's factual findings except where clearly erroneous.

twenty, he was charged in Virginia state court with arson and destruction of property after a suicide attempt. To assess his mental state, the court referred him for an evaluation by Dr. Kenneth McWilliams, a clinical psychologist.

McWilliams diagnosed Farabee with borderline personality disorder and noted that other doctors had made the same diagnosis.[2] McWilliams found that "Farabee may well meet [the] legal criteria for an [insanity] defense." J.A. 1344. He also advised that Farabee required "much more intensive and sophisticated therapy for childhood abuse/neglect issues than he [was] currently receiving" and that he was "unlikely to find such therapy within a state hospital." *Id.* In McWilliams's view, hospitalizing Farabee without giving him the therapy he needed "may well result in a life sentence to a psychiatric hospital" because "long-term placement in institutional settings virtually never prove[s] useful for treatment of borderline personality disorder." *Id.*

Due in part to McWilliams's report, Farabee was found not guilty by reason of insanity and was institutionalized at Central State Hospital in Virginia. He was later found guilty of two counts of malicious wounding after assaulting a peer and was incarcerated for twelve years. Upon completing his sentence, he was again committed to Central State

---

*See* Fed R. Civ. P. 52(a)(6); *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573–76 (1985).

[2] According to Dr. McWilliams, "[b]orderline personality disorder is characterized by such things as recurrent episodes of intense anger and sadness, strong fears of abandonment, a frequent need to press relationships to see if rejection will follow, impaired self-esteem, poor frustration tolerance, impulsiveness in areas such as drug use and sexual behavior, recurrent suicidal thoughts and self-mutilation." J.A. 1341.

Hospital. Farabee's treatment there between August 2012 and September 2015 is the subject of this case.

B.

Farabee filed this suit in March 2014 against Yaratha, Vauter, and six other hospital employees.[3] Yaratha, a psychiatrist at the hospital during the relevant period, was Farabee's principal treatment team leader, meaning he was usually in charge of making treatment decisions. Vauter is a clinical psychologist and the hospital's director.

In his final amended complaint, Farabee raised four due process claims. Count One charged all defendants with denying Farabee necessary medical treatment: specifically, dialectical behavior therapy ("DBT"), a treatment for borderline personality disorder that involves intense one-on-one discussion of past traumas and is administered by psychologists. According to Farabee, even though McWilliams and two other doctors had suggested DBT and Farabee had asked for it repeatedly, Yaratha and his co-defendants never allowed it. Count Two alleged that Yaratha, Vauter, and another doctor forcibly gave Farabee psychotropic drugs (i.e., drugs that affect thoughts, emotions, and behavior) on several occasions absent any medical emergency. Count Three charged that Barnette caused Farabee to be placed in four-point restraints by falsely reporting that Farabee had

---

[3] The other six defendants were Nataya Barnette, a nurse; Dr. Cynthia Maghakian, another psychiatrist who sometimes filled in for Yaratha and was briefly Farabee's team leader while he was assigned to another ward; Dr. Ronald Forbes, a psychiatrist and Medical Director at the hospital; Dr. Markita Wolf, a clinical psychologist; Vicki Montgomery, the hospital's CEO; and Jim Bell, a forensic unit director at the hospital. The latter two were omitted from Farabee's final amended complaint.

5

kicked her.[4]  Count Four alleged that Yaratha, Vauter, and two others "allow[ed] and affirmatively induc[ed]" another patient, Justin Evans, to assault Farabee repeatedly as retaliation for the many administrative complaints Farabee had filed in his time at the hospital.  J.A. 80.

A six-day bench trial ensued.  As to Count One, it was undisputed that Farabee asked for but never received DBT.  Farabee called as witnesses McWilliams[5] and two doctors who evaluated Farabee around August 2012: Angela Torres, a clinical psychologist at Central State Hospital, and Cleve Ewell, a forensic psychiatrist at another hospital.  Each of the three testified that they had written post-evaluation reports suggesting that Farabee be given DBT.

On the witness stand, McWilliams insisted that DBT was the right treatment for Farabee, while Torres and Ewell framed DBT as merely one of several recommendations they had made.  McWilliams also opined that denying a patient treatment due to his bad behavior is "kind of [at] cross-purposes" because the purpose of treatment is to help patients stop behaving badly, although he said that he couldn't "fully disagree with why [Yaratha's team denied Farabee DBT] because [he didn't] fully understand why they did it."  J.A. 507.  And Torres and Ewell acknowledged that they spent limited time with Farabee and that doctors who provide day-to-day treatment—like Yaratha's team—are best

---

[4] Count Three isn't at issue in this appeal.  Farabee initially named Yaratha as a co-defendant on Count Three but later removed him.  *See* J.A. 540.

[5] McWilliams testified as both a lay witness (about his 1998 evaluation of Farabee) and as an expert witness (about whether DBT is appropriate for a patient like Farabee).

6

equipped to make treatment decisions for any given patient. None of these doctors opined that the decision not to give Farabee DBT lacked a basis in accepted professional opinion.

Yaratha and Maghakian testified that while they had read the other doctors' reports, they didn't offer Farabee DBT because they believed its risks to Farabee outweighed its benefits. Yaratha was specifically concerned about Farabee's ability to "address past stressors," which is "an integral part of DBT," given that he "couldn't adequately address current stressors."[6] J.A. 917. Moreover, Yaratha said, Farabee hadn't shown that he could cooperate with therapists in one-on-one sessions. Hospital reports corroborate that Farabee frequently refused to attend one-on-one sessions with psychologists and, when he did attend, acted with hostility toward them. *See* J.A. 1245, 1256–60, 1374. Reports also show that Yaratha's team continued to meet and discuss treatment options with Farabee. *See* J.A. 1256–60.

Maghakian agreed that Farabee wasn't sufficiently "healthy and motivated," J.A. 824, to participate in DBT and that the treatment would have made him more paranoid and anxious. She explained that the hospital offered Farabee various other treatments,

---

[6] The clinicians who testified at trial disagree about whether Farabee's primary diagnosis is Borderline Personality Disorder or Antisocial Personality Disorder (which is manifested by deceit for self-gain). McWilliams believes the former is primary and that Farabee may not even have the latter; Torres and Ewell believe Farabee has both, but the former is primary; and Yaratha and Maghakian opined that Farabee has both, but the latter is primary. According to Maghakian, DBT doesn't treat antisocial personality disorder. Yaratha maintains that this difference of opinion accounts for the disagreement about DBT's appropriateness for Farabee.

7

including medication, group therapy, and occasional one-on-one meetings with psychologists, but Farabee refused them all. Additionally, Vauter testified that the hospital didn't employ a psychologist who could perform DBT, but if Farabee's treatment team (led by Yaratha) had requested it, she is "certain there would [have been] a way" for the hospital to obtain such a psychologist. J.A. 562. And an expert witness, a psychiatrist named Dr. Robert Pitsenbarger, testified that DBT could traumatize someone with Farabee's personality traits and that deciding whether to offer DBT to a patient with Borderline Personality Disorder involves risk-benefit analysis that day-to-day treatment teams are best positioned to perform.

As to Count Two, the parties stipulated that Farabee was forcibly medicated eight times while under Yaratha's supervision in 2013 and 2014. But they disputed whether medical emergencies justified these forced medications. According to Yaratha, Farabee was either threatening to harm others or himself or smearing feces on the walls on the dates in question, and on other days, Farabee asked to be medicated because he felt agitated. Yaratha also introduced contemporaneous notes indicating that he had prescribed Farabee psychotropic drugs on an as-needed basis to deal with his agitation. Farabee's only evidence on this point was his own testimony denying that he had made threats or smeared feces.

As to Count Four, it was undisputed that Evans attacked Farabee on three occasions in the summer of 2015. The first attack was on July 23. Evans assaulted and bit Farabee, and Farabee reported the incident to his treatment team. The next day, Evans was transferred to a different ward by another doctor, but on July 28, Yaratha ordered that Evans

8

be transferred back to Farabee's ward, ostensibly because Evans had engaged in self-harm and expressed discomfort in the other ward. On July 30, Evans attacked Farabee again, cutting his head with a sharp object before hospital staff quickly intervened. Despite Farabee's request that he and Evans be separated, they were kept in the same hall of the same ward with just one room between them, even though the ward could accommodate over twenty patients. On August 13, Evans charged into Farabee's room and attacked him while he slept.

Evans testified that Yaratha and Maghakian had encouraged him to attack Farabee. According to Evans, Yaratha gave him subtle reminders that Evans depended on him for food and clothes, and staff members gave Evans food, drugs, and alcohol after his attacks, saying things like "[k]eep up the good work" and "Yaratha sends his regards." J.A. 1996. Farabee also testified that he overheard Yaratha and Wolf (a psychologist) conspiring to retaliate for his many complaints and that Evans had told him that Yaratha and Wolf had encouraged the attacks.

Yaratha denied these accusations. He explained that Farabee and Evans were kept in the same ward after Evans's first two attacks because it had the least patients of any ward, which enabled staffers to monitor them closely and decreased the likelihood that Farabee or Evans would antagonize other patients (as they had both done in the past). Indeed, two staffers were assigned to be near Farabee at all times. They were seated outside Farabee's room when Evans entered to attack Farabee on August 13, and they separated the two almost immediately. Yaratha also introduced a list (dated July 31, 2015) of ten ways the staff had planned to manage Farabee and Evans.

9

The district court entered judgment for Farabee (and against Yaratha) on Counts One and Four. It rejected Farabee's Count Two claim that he was forcibly medicated in violation of his rights. The court also ruled for Vauter on all counts but nevertheless enjoined her "to make available to [Farabee] DBT treatment, if and when [Farabee] is committed to an institution that is under her control."[7] JA 1216, 1222. As to Count One, the court awarded Farabee $100,000 in compensatory damages. As to Count Four, the court awarded $200,000 in compensatory and $50,000 in punitive damages. Yaratha, Vauter, and Farabee now appeal.

## II.

The issues before us are (1) whether the district court clearly erred in ruling for Farabee on Counts One and Four; (2) whether the court erred as a matter of law in enjoining Vauter without finding that she violated Farabee's rights; and (3) whether, as to Count Two, the court improperly placed upon Farabee the burden of proving that no medical emergency justified the forced medications. We consider each issue in turn, reviewing factual issues for clear error and legal issues de novo. *See Equinor USA Onshore Properties Inc. v. Pine Res., LLC*, 917 F.3d 807, 813 (4th Cir. 2019).

---

[7] The district court also made several rulings that were not appealed. The court dismissed Forbes as a defendant at the summary judgment stage; entered judgment for Wolf at the end of Farabee's case and for Maghakian after the trial; ruled in favor of all defendants except Yaratha on Counts One and Four; and on Count Three, found that Barnette had falsely reported that Farabee had kicked her, thereby causing Farabee to be put in four-point restraints.

A.

We first consider Yaratha's argument that the district court clearly erred on Count One by finding that his denial of DBT wasn't based on a professional judgment and thereby violated Farabee's due process rights. We agree with Yaratha.

Involuntarily confined residents at state mental institutions have due process interests in conditions of reasonable care. *Youngberg v. Romeo*, 457 U.S. 307, 324 (1982). In evaluating these due process claims, courts apply what is known as the *Youngberg* standard. Under this standard, liability "may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 323. "It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." *Patten v. Nichols*, 274 F.3d 829, 836 (4th Cir. 2001) (quoting *Youngberg*, 457 U.S. at 321). Courts must simply ensure that the "choice in question was not a sham or otherwise illegitimate." *Id.* at 845 (emphasis omitted) (quoting *Romeo v. Youngberg*, 644 F.2d 147, 178 (3d Cir. 1980)). This standard is more deferential to doctors than negligence or medical malpractice standards. *Id.* Plaintiffs bear the burden of proof by a preponderance of the evidence. *See id.* at 843–46.

Here, the district court concluded that Yaratha's decision not to provide Farabee with DBT was "not within the realm of professional judgment." J.A. 1211. It based this ruling on several factual findings. We find it useful to disaggregate these findings.

11

First, the court found—relying on the testimonies of McWilliams, Torres, and Ewell—that Farabee's primary diagnosis was Bipolar Personality Disorder, that DBT is an "appropriate treatment" for him, that group therapy and antipsychotic drugs are inappropriate, and that Yaratha erroneously rejected the other doctors' suggestion without consulting a clinical psychologist. J.A. 1198. The court was unpersuaded by Yaratha's and Maghakian's testimonies about DBT's risks to Farabee. This was because, in the court's view, psychologists like McWilliams and Torres "generally have more training in and experience with DBT than psychiatrists" like Yaratha and Maghakian, "and the testimony of psychologists should outweigh the testimony of psychiatrists as to DBT and the treatment of [Bipolar Personality Disorder]." *Id.* Because there was conflicting evidence on these points, we conclude that the court's findings weren't clear error.

Second, the court found that Yaratha "made the decision not to offer [DBT] based upon [Farabee]'s exceedingly bad conduct, which is a classic symptom of his [disorder]." *Id.* As the court further explained:

> Instead of understanding that such behavior is a symptom of Plaintiff's [Bipolar Personality Disorder] and that it is the responsibility of the treatment provider to work through it, Dr. Yaratha used such behavior as grounds to deny Plaintiff the DBT treatment he needed.

*Id.*

Insofar as the court meant to imply—as Farabee suggests in his brief—that Yaratha withheld DBT because he wanted to avoid dealing with Farabee, we conclude that this finding would be clear error. Yaratha's team met with Farabee many times and tried various treatments for him, including medication and individual and group therapies. J.A.

12

824–25, 837–39, 929, 938–40, 958, 959, 961, 967–68, 1026, 1031, 1256–60. There's no indication that offering DBT would have burdened Yaratha in particular. He wouldn't have been the one administering DBT; a psychologist would have done it. And Vauter testified that the hospital could have retained a psychologist who could perform DBT had Yaratha's team asked for it. Accordingly, we have no reason to think that the cost or hassle of enlisting a psychologist affected Yaratha's decision. In fact, if Yaratha disliked dealing with Farabee's bad behavior, and if he believed (like the district court) that DBT would have mitigated that behavior, it seems logical that he would have ordered the treatment.

The district court also suggested that Yaratha could have had Farabee transferred to another hospital to receive DBT. *See* J.A. 1210. That would have accomplished Yaratha's supposed goal of avoiding Farabee. The fact that Yaratha didn't have Farabee transferred further corroborates that his withholding of DBT wasn't motivated by an unwillingness to deal with Farabee. In sum, Farabee's theory for why Yaratha withheld DBT doesn't add up.

On the other hand, if the district court believed that Farabee's conduct affected Yaratha's medical judgment—which, given the court's use of "understanding," we think is the best reading of the court's order—that is consistent with Yaratha's explanation for his decision. Yaratha said that Farabee was unable to deal with current stressors and couldn't cooperate with therapists in one-on-one sessions. The court disagreed with this analysis, but didn't find it to be a pretext for a decision made in bad faith.

It is of course possible that a defendant like Yaratha will offer a medical pretext for a decision made in bad faith. In fact, Count Four of Farabee's complaint is premised on an

13

allegation that Yaratha bore animus toward Farabee and thus induced another patient to assault him. The district court ruled for Farabee on Count Four in part because it found Yaratha's testimony "inconsistent and conflicting in many important respects." J.A. 1207. But the court made no such finding as to Yaratha's testimony about DBT, and our review doesn't lead us to that conclusion either. Further, Count One is based solely on the hospital's denial of DBT; it doesn't include the allegations underlying Count Four. *See* J.A. 1194 n.1. And the district court found Yaratha's testimony credible as to Count Two, *see* J.A. 1201 (referring to his testimony as "credible evidence"), indicating that its Count Four credibility finding didn't bleed into the other counts. We thus decline to ascribe the district court's Count Four credibility finding to Count One.

In short, the district court's findings don't support a ruling that Yaratha breached the *Youngberg* standard. There is a middle ground between a good decision and a "sham" decision. *See Patten*, 274 F.3d at 845. We are left with the definite and firm conviction that, at worst, Yaratha's decision fell within that middle ground.

The record supports this view. Assume that the district court was correct in giving McWilliams's and Torres's opinions great weight. We've reviewed the transcript of their testimonies. Nothing they or Ewell said suggests that the choice not to offer Farabee DBT was "arbitrary and unprofessional" or worse than "ordinary medical negligence." *See id.* at 845–46 (finding that the defendants' conduct was no more than ordinary medical negligence and did not so depart from professional standards as to be arbitrary and unprofessional). McWilliams was the only one who criticized Yaratha's decision. He opined that medication wouldn't cure Farabee's problem and that persons with Borderline

14

Personality Disorder need individual therapy before they can muster the strength to undergo group therapy.

But a professional disagreement doesn't support a due process claim. While witnesses need not use legal terms like "professional judgment," there must be *something* in the record suggesting that a decision not to offer a particular treatment was "completely out of professional bounds." *Id.* at 845 (quoting *United States v. Charters*, 863 F.2d 302, 313 (4th Cir. 1988)). Absent such evidence, a choice not to offer a certain treatment—like a choice not to order an X-ray—"is a classic example of a matter for medical judgment." *Estelle v. Gamble*, 429 U.S. 97, 107 (1976). At worst, it is medical malpractice. *Id.*

We don't overturn a district court's factual findings lightly. *See Anderson*, 470 U.S. at 573–575. But this case is unique because of the deference required by *Youngberg*. Absent a finding by the district court that Yaratha lied on the witness stand about why he withheld DBT, there's simply no evidence that his decision—while perhaps misguided— was a sham. Indeed, the district court's own summary of the evidence doesn't support its conclusion.[8] *See Butts v. United States,* 930 F.3d 234, 241 (4th Cir. 2019) (finding clear error because the district court's conclusion after a bench trial wasn't supported by substantial evidence in the record), *petition for cert. filed*, No. 19-740 (U.S. Dec. 6, 2019).

Accordingly, we find that the district court clearly erred in finding for Farabee on Count One.

---

[8] Because we reverse the district court's Count One ruling on other grounds, we decline to consider Yaratha's argument that McWilliams's expert testimony was improperly admitted.

B.

Next, we consider Yaratha's contention that the district court clearly erred on Count Four by finding that he encouraged Evans to attack Farabee and thereby violated Farabee's due process right to safe conditions. Yaratha argues that Farabee's and Evans's testimonies were implausible, rife with inconsistencies, and partially contradicted by documentary evidence. While Yaratha's argument gives us some pause, we are constrained to affirm the district court on Count Four.

Count Four is also governed by the *Youngberg* standard. In this context, that standard is akin to recklessness or gross negligence. *See Patten*, 274 F.3d at 843 (collecting cases). A conscious decision to allow or encourage one patient to attack another plainly violates that standard.

The district court found that Count Four boiled down to a credibility contest. In the court's view, Evans and Farabee were credible because their testimonies were similar in some respects and because some of it was corroborated by circumstantial evidence.[9] The court found that Yaratha wasn't credible because his testimony was "inconsistent and conflicting in many important respects." J.A. 1207.

For instance, Farabee's ward closed shortly after Evans's attacks, which the court thought conflicted with Yaratha's assertion that neither Evans nor Farabee could be moved

---

[9] For example, Evans was found with drugs shortly after he attacked Farabee in August 2015, and video from the hospital showed that Evans and Farabee were only one room apart from each other on August 13, despite their history. The court was also impressed that Evans was willing to testify on Farabee's behalf despite their long history of animosity toward each other.

16

to another ward. Also, staff in Farabee's ward didn't appear to have cooperated with an investigation into how Evans obtained drugs, and Yaratha didn't call any of that ward's staff to testify. Additionally, the court highlighted that, in October 2014, Yaratha had included Barnette's false claim that Farabee kicked her in his annual report regarding whether Farabee should remain confined in a mental hospital, even though Yaratha knew Barnette's claim was false. At trial, Yaratha painted this as an oversight.

Ultimately, the court found that:

> After failing to prevent Evans from attacking Plaintiff and then ordering Evans back to Ward 8 in close proximity to Plaintiff, Dr. Yaratha intentionally provided Evans with greater access to Plaintiff. He then suggested to Evans that he might be rewarded rather than punished for attacking Plaintiff, which clearly represents a complete departure from professional judgment.

J.A. 1214.

While we review all factual findings for clear error, we give particular deference to findings based on witness-credibility determinations. *See Anderson*, 470 U.S. at 575. In these situations, we only find clear error where documentary evidence contradicts a witness's story or where the story itself is internally inconsistent or facially implausible, leaving only one permissible view of the evidence. *Id.*; *see also United States v. Wooden*, 693 F.3d 440, 454–56 (4th Cir. 2012) (finding clear error because the testimony on which the district court relied contained various inconsistencies).

As Yaratha details in his brief, there are many issues with Farabee's and Evans's testimonies. For instance, their testimonies differed with respect to many important details, including which staffers gave Evans drugs and alcohol and whether Yaratha explicitly

17

asked Evans to hurt Farabee. Additionally, Farabee repeatedly denied well-documented facts that didn't support his case.[10] And Evans told an investigator in September 2015 that staffers had not given him alcohol, drugs, or any other reward for attacking Farabee— contrary to his testimony in this case. Evans's testimony about how Yaratha encouraged his attacks is also suspiciously vague. And, in holding Evans's return to Farabee's ward against Yaratha, the district court appeared to discount Evans's testimony (1) that Evans was only returned to that ward because he made clear that he wasn't comfortable anywhere else and (2) that Evans and Farabee were constantly monitored.

That Farabee and Evans would lie on the stand is to be expected, Yaratha posits, because they each have been diagnosed with Antisocial Personality Disorder, whose symptoms include lying for personal profit or pleasure. But while it would have been appropriate for the district court to exercise some caution when considering the patients' testimonies given their diagnoses (as the court did with respect to Count Two, *see* J.A. 1201), it would have been error to discredit their testimonies on that basis alone.

Despite the issues Yaratha identifies, we cannot say that the district court's conclusion is unsupported by the record. Yaratha did have a motive to retaliate against Farabee for his many complaints. The decision to put Evans in a room so close to Farabee is itself suspicious. Most of the problems with Farabee and Evans's testimonies—except for Evans's September 2015 statement to the investigator—are collateral to the allegations

---

[10] Specifically, Farabee disputed hospital reports that he had (among other things) failed to attend group therapy sessions, refused to meet with certain doctors, punched another patient and a staffer, intentionally clogged toilets, and defecated on the floor.

18

in Count Four. And Yaratha had some credibility issues himself, as the district court observed. We don't think the evidence points overwhelmingly in one direction. Were we the trier of fact, perhaps the result might have been different. But we are not "left with the definite and firm conviction" that the district court erred. *See Anderson*, 470 U.S. at 573. Thus, we are constrained to affirm on Count Four.[11]

C.

We turn now to consider whether the district court erred by enjoining Vauter to make DBT available to Farabee.[12] Ordinarily, we review injunctive orders for abuse of discretion. *See Emergency One, Inc. v. Am. Fire Eagle Engine Co.*, 332 F.3d 264, 267 (4th Cir. 2003). But because Vauter asserts that the injunction is based on legal errors, and any legal error is an abuse of discretion, we effectively review her challenge de novo. *See Hunter v. Earthgrains Co. Bakery*, 281 F.3d 144, 150 (4th Cir. 2002).

We agree with Vauter that the injunction was improper, for three reasons. *First*, the district court didn't find Vauter liable on any counts; i.e., the court didn't find that she violated Farabee's rights. A defendant who has not violated a plaintiff's rights cannot be

---

[11] We don't think it incongruous to affirm on Count Four despite reversing on Count One. The counts involve different issues: Count Four comes down to credibility determinations, while Count One comes down to an evaluation of a medical decision. And the district court's opinion didn't suggest that its findings on the two counts were interdependent. To the contrary, the court noted that Count One didn't incorporate the allegations underlying Count Four. *See* J.A. 1194 n.1.

[12] The district court ruled for Vauter on Count One because she "relied on [Farabee's] treatment team to recommend what resources were necessary for his medical care" and later transferred Farabee to a hospital that could offer DBT. J.A. 1211.

enjoined. *See Bloodgood v. Garraghty*, 783 F.2d 470, 476 (4th Cir. 1986) ("To slap injunctions on state officials who have never violated the law or shown any intention to violate the law would exceed the proper bounds of equitable discretion."); *see also Greensboro Prof'l Fire Fighters Ass'n v. City of Greensboro*, 64 F.3d 962, 967 n.6 (4th Cir. 1995) (declining to order entry of "an injunction to prohibit 'prospective acts of harassment' . . . . [b]ecause appellants have failed to establish municipal liability . . . [and thus] are not entitled to any remedy against the City."). *Second*, as explained above, we don't think Yaratha's denial of DBT violated Farabee's due process rights, leaving no basis as to any defendant for the injunction. And *third*, Farabee's claim for injunctive relief against Vauter is moot because he's no longer in her custody. Instead, Farabee is in the custody of the Virginia Department of Corrections. *See Incumaa v. Ozmint*, 507 F.3d 281, 286–87 (4th Cir. 2007) ("[T]he transfer of an inmate . . . to a different unit or location where he is no longer subject to the challenged policy, practice, or condition moots his claims for injunctive and declaratory relief . . . .").

Accordingly, we vacate the injunction against Vauter.

D.

Finally, we consider whether the district court erred on Count Two by placing upon Farabee the burden of proving that no emergencies justified his forced medications. As this is a legal question, we review it de novo.

Persons in state custody, including mental patients, have a due process interest in not being forcibly given psychotropic medication. *Johnson v. Silvers*, 742 F.2d 823, 825 (4th Cir. 1984) (addressing mental patients); *see Washington v. Harper*, 494 U.S. 210, 221–

20

22 (1990) (addressing mentally ill state prisoners). A plaintiff may recover if a defendant acting under color of state law caused him to take psychotropic drugs against his will and the defendant didn't exercise professional judgment in administering the drugs. *See Johnson*, 742 F.2d at 825; *see also Farabee v. Feix*, 119 F. App'x 455, 458 n.3 (4th Cir. 2005) (unpublished) (summarizing *Johnson*'s holding). In other words, Count Two is governed by the *Youngberg* standard. *See Johnson*, 742 F.2d at 825.

The parties agree that when a treatment provider forcibly medicates a patient in response to an emergency—like when the patient may harm himself or others—the provider isn't liable because he acted with professional judgment. They disagree as to whether emergencies existed in the eight instances in which Farabee was forcibly medicated in 2013 and 2014. The district court ruled for Yaratha, stating that "[w]hile the evidence is conflicting, [Farabee] has not met his burden of proof." J.A. 1212. Farabee now posits that the existence of an emergency is an affirmative defense, which a defendant must prove. We do not agree.

We generally require the plaintiff to show that the defendant acted without professional judgment. *See Patten*, 274 F.3d at 843–846 (granting the defendant summary judgment because the plaintiff's evidence didn't show a breach of the professional-judgment standard); *Johnson*, 742 F.2d at 825 (stating that the plaintiff had to show that the "defendant [had] required him to take anti-psychotic drugs without exercising professional judgment"). This is in keeping with the default rule that "plaintiffs bear the risk of failing to prove their claims." *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56 (2005).

21

We see no reason to make an exception to that rule here.  Accordingly, we affirm the district court's judgment for Yaratha on Count Two.


## III.

For the reasons given, we reverse the district court's judgment as to Count One, remand for entry of judgment on that count for Yaratha, and vacate the injunction against Vauter.  We otherwise affirm the district court's judgment.

*AFFIRMED IN PART, VACATED IN PART,*
*REVERSED IN PART, AND REMANDED*